FILED

AT 2:59 O'CLOCK P M.
May 8, 2023
SHERRY GRIFFIS
CLERK DISTRICT COURT
HARRISON COUNTY, TEXAS
BY _____
DEPUTY CLERK

CAUSE NO. 23-0471

| | | |
|---|---|---|
| THE SABINE MINING COMPANY AND THE NORTH AMERICAN COAL CORPORATION, | § § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § § | |
| v. | § § | 71ST JUDICIAL DISTRICT |
| SOUTHWESTERN ELECTRIC POWER COMPANY, | § § | |
| *Defendant.* | § | HARRISON COUNTY, TEXAS |

## PLAINTIFFS' ORIGINAL PETITION AND VERIFIED APPLICATION FOR INJUNCTIVE RELIEF

COME NOW Plaintiffs The Sabine Mining Company ("Sabine") and The North American Coal Corporation ("NACC") (Sabine and NACC are referred to collectively as "Plaintiffs"), and file this Original Petition and Verified Application for Injunctive Relief against Defendant Southwestern Electric Power Company ("SWEPCO" or "Defendant").

### INTRODUCTION

For over 30 years, the Pirkey Power Plant in Hallsville, Texas has provided millions of Texans with reliable and low cost power using the lignite coal supplied by Plaintiff The Sabine Mining Company. In late 2020, the majority owner of the plant—Defendant SWEPCO—made the unilateral decision to retire the facility due to a perceived non-compliance with a coal combustion residuals rule. Plaintiffs, and many others, have challenged that decision in multiple state administrative proceedings. Nevertheless, SWEPCO has marched forward with the closing and is now proceeding with the demolition and reclamation of the Pirkey Power Plant, all in violation of the contract between Sabine and SWEPCO and the promise made to the communities of East Texas. Plaintiffs therefore seek an injunction

Page 1 of 19

TRUE AND CORRECT COPY

to preserve the status quo and prevent SWEPCO from taking any action to close or demolish the Pirkey Power Plant until the prudence of SWEPCO's decision is resolved through the administrative or judicial process.

## I.
### DISCOVERY CONTROL PLAN

1.      Plaintiffs intend to conduct discovery under Level 3 of the Texas Rules of Civil Procedure, Section 190.4.  Plaintiffs also move for leave to conduct expedited discovery.

## II.
### PARTIES

2.      The Sabine Mining Company is a Nevada corporation with its principal place of business in Texas.

3.      The North American Coal Corporation is a Delaware corporation authorized to do business in the State of Texas.

4.      Southwestern Electric Power Company is a Delaware corporation authorized to do business in the State of Texas who may be served with process via its registered agent, CT Corporation System at 1999 Bryan St., Suite 900, Dallas, Texas 75201.

## III.
### JURISDICTION AND VENUE

5.      Jurisdiction is proper in this Court pursuant to Section 24.007 of the Texas Government Code.  The amount in controversy is within the jurisdictional limits of the Court.

6.      This court may exercise personal jurisdiction over Defendant because it is registered to do business in Texas, entered into and conducts business in Texas, and the acts at issue in this matter relate to a power plant located in Texas.

TRUE AND CORRECT COPY

7. Venue is proper in Harrison County, Texas because all or a substantial part of the events or omissions alleged below and in this lawsuit occurred in Harrison County, Texas and the power plant at issue is located in Harrison County, Texas. *See* TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1).

## IV.
## RULE 47 DISCLOSURE

8. Pursuant to Tex. R. Civ. P. 47, this is an action for breach of contract. In addition to injunctive relief, Plaintiffs seek monetary relief over $1,000,000.[1]

## V.
## FACTS

9. The Henry W. Pirkey Power Plant ("Pirkey Power Plant") is a roughly 720-MW single-unit coal-fired power plant located in Hallsville, Texas. The Pirkey Power Plant has been providing low-cost, reliable power to its customers since 1985. Pirkey Power Plant is equipped with some of the most advanced emission control equipment to limit its NOx, SO2, and particulate matter emissions. This includes operation of a low NOx burner with overfire air to reduce its NOx emissions, a wet scrubber to reduce its SO2 emissions, and an electrostatic precipitator to reduce its particulate matter emissions.

---

[1] The Agreement at issue contains an arbitration provision that does not apply to this dispute. *See, e.g.,* __Exhibit 1__, Article XX, § 4 (providing that the "rights of termination . . . shall not be subject to arbitration"); Article XVIII (noting that whether "any act, event, decision, determination or other matter *is or is not to be done*" at the option, election, request or determination or in the opinion of SWEPCO "shall not be subject to arbitration."). Regardless, Texas law allows for injunctive relief even when a valid arbitration provision applies. *Comed Med. Sys., Co. v. AADCO Imaging, LLC*, No. 03-14-00593-CV, 2015 Tex. App. LEXIS 1762 (Tex. App.—Austin Feb. 25, 2015, no pet.).

TRUE AND CORRECT COPY

10. The source of coal for the Pirkey Power Plant is the Sabine Mine operated by The Sabine Mining Company—a wholly-owned subsidiary of The North American Coal Corporation.



Sabine Mining Company is a large industrial customer taking electric power service from SWEPCO. And as the operator of the mine that supplies lignite coal to the Pirkey Power Plant, NACC, through Sabine Mining Company, has been adversely impacted by decisions made by SWEPCO concerning the Pirkey Power Plant.

11. Defendant SWEPCO owns 580 megawatts (roughly 86%) of generating capacity at Pirkey Power Plant. The earliest recitals of the original 1981 agreement between Sabine and SWEPCO reflect that Sabine was tasked "to design, develop, construct, and operate by surface mining techniques a lignite mine" for the sole purpose of supplying fuel to the Pirkey Power Plant. Throughout the lengthy term of the parties' relationship, the agreement has been amended and restated many times, including most recently in 2008, when the parties set an end term of 2035. *See* Exhibit 1 (Third Restatement of Lignite Mining Agreement ("Agreement")).

TRUE AND CORRECT COPY

12. Despite its agreement to use Sabine-mined lignite coal to power the plant through 2035, in late 2020 SWEPCO announced its plans to retire the Pirkey Power Plant in 2023 rather than continue the plant's operations. According to SWEPCO, the Pirkey Power Plant could no longer operate due to a 2020 U.S. Environmental Protection Agency ("EPA") rule requiring certain surface impoundments that collect coal combustion residuals be retrofitted with appropriate liners. *See* 40 C.F.R. § 257.103(f)(3)(i)(C). Since that time, SWEPCO has indicated that in actuality the Pirkey Power Plant is simply no longer a fruitful economic operation for SWEPCO.

13. In SWEPCO's press release announcing the closures, SWEPCO's then-CEO remarked "Our Pirkey . . . employees have provided decades of safe and reliable service to SWEPCO customers, which will continue until the transition is complete." *See* Exhibit 2. The CEO also promised, "We are committed to working with our employees, local leaders and our communities in East Texas to help them manage these transitions." *Id.* But SWEPCO's actions after the announcement belie that promise and breach its Agreement with NACC.

14. First, SWEPCO applied for a Certificate of Convenience and Necessity ("CCN") authorization and related relief for the acquisition of three renewable generating facilities.[2] Further, SWEPCO has applied to reconcile their eligible incremental fuel costs for the reconciliation period of January 1, 2020 through December 31, 2021. Multiple interested parties have intervened—including NACC—to challenge the prudence of SWEPCO's decision to retire the Pirkey Power Plant because, in part, SWEPCO could have kept the plant

2 *See, generally* SOAH Docket No. 473-2200991; PUC Docket No. 53625. The Administrative Law Judge recently issued a Proposal for Decision, which has not yet been adopted by the Public Utility Commission.

TRUE AND CORRECT COPY

running until at least 2028 without incurring any additional or extraordinary cost and remaining in full compliance with the EPA's rule. The Public Utility Commission of Texas' prudence determination will ultimately impact SWEPCO's ability to recover the outstanding unrecovered fuel costs associated with the Pirkey plant, which are at issue in that proceeding.

15.     While the decision to close the Pirkey Power Plant is being challenged, SWEPCO has recently begun moving ahead with the plant shutdown, and has started to dismantle or demolish plant assets, equipment and lay off employees.  Based on a recent email from SWEPCO, it has taken or is preparing to take the following action:

| H. W. Pirkey Power Plant<br>Closure update: | |
|---|---|
| Main power transformer transmission lines disconnected. | Sludge runoff pond being modified to accept 180 degree brine water from the natural gas powered evaporators. |
| Generator vented and purged. | Fuel building being switched to Upshur Rural power. |
| Turbine oil has been drained. | Coal bunkers empty and washed. |
| Natural gas supply line is being purged. | Coal silo #1 has 33% bridging. |
| Lake Of the Pines water pipeline shut off. | Dust collectors (8) have had bags removed and are washed out. |
| Stopped operation of bottom ash system to East ash pond and closed pipeline. (Friday) | Asset Recovery group is selling selected plant assets. |
| Primary surge pond being cleaned. | April 28th, most personnel will leave, except for Operations personnel for security and fire watch. |
| Scrubber tower/thickners being cleaned. | Demolition contractor will assume control of site, date yet to be determined. |

16.     These actions are in direct contravention to SWEPCO's agreement to continue utilizing Sabine's lignite coal throughout the lifespan of the Agreement.  The "Post Production Period" does not occur until "the mining and delivery of lignite coal to SWEPCO hereunder ceases and the final Mine closing and Post-Production Period reclamation commences." *See* Exhibit 1, Article I.   The Agreement contemplates that such event will not occur until 2035:

  –  "This Agreement shall commence on the date hereof and shall remain in effect until 2035 ***and thereafter*** until the Mine has been closed, the reclamation work has been completed, the permit bonds have been released, and the permit to mine has been satisfied by successfully completion of all reclamation operations in accordance with the approved Mining Plan." *See* Exhibit 1, Article II.

TRUE AND CORRECT COPY

— "Sabine has provided to SWEPCO in writing a mining plan covering life of Mine requirements ("Life of Mine Plan") for the design, development, construction and operation of the Mine to furnish from SWEPCO's Reserves the lignite requirements requested by SWEPCO under the provisions of Article V hereof for the period 2008 through 2035." *See* Exhibit 1, Article IV.

— Termination can occur "if at any time all economically surface mineable lignite reserves in SWEPCO's Reserves have been depleted or SWEPCO's Plant has reached the end of its useful life (estimated to be 2035)." *See* Exhibit 1, Article XX.

Rather than fulfill the terms of the Agreement, SWEPCO unilaterally and improperly declared that the Post Production Period had begun in its February 15 letter to Plaintiffs based on the premature closure of the plant. *See* Exhibit 3.

17.    In short, SWEPCO is performing these demolition and reclamation actions despite agreeing to require lignite coal for the Pirkey Power Plant through at least 2035. And SWEPCO has not otherwise exercised any right to terminate the Agreement altogether.[3] If these actions are allowed to continue, it will irreparably damage and render useless a power plant that could potentially remain in use for at least 12 years of its useful economic life, causing irreparable harm to Plaintiffs as a result.

## VI.
## CAUSES OF ACTION

18.    All preceding paragraphs are hereby incorporated as if fully set forth herein.

**A.    Breach of Contract**

19.    Sabine and SWEPCO entered into a valid and enforceable contract, most recently the Third Restatement of Lignite Mining Agreement.

---

[3]    Under the Agreement, both parties have the right "in their respective unqualified and unrestricted discretion and without requirement of cause, to terminate the relationship created by this Agreement by giving notice of termination . . . which shall not be earlier than one year from the date of such notice . . . ." Exhibit 1, Article XX.

TRUE AND CORRECT COPY

20. Sabine has fully performed under the Agreement.

21. By the conduct outlined above, SWEPCO has breached the provisions of the Agreement.

22. Texas law also requires a party to perform its duties under a contract with care, skill, reasonable expedience, and faithfulness. *See Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991). Moreover, every contract contains an implied duty to cooperate. *See Case Corp. v. Hi-Class Bus. Sys.*, 184 S.W.3d 760, 770 (Tex. App.—Dallas 2005, pet. denied). To the Uniform Commercial Code, Texas Business & Commerce Code Section 1.304 imposes a duty of good faith on SWEPCO, which SWEPCO breached by failing to continue the requirements contract. Finally, the Uniform Commercial Code, Texas Business & Commerce Code Section 2.306 requires that quantities purchased in a requirement contract must be in good faith. "[A] shutdown merely to curtail losses" is not in good faith. Tex. Bus. & Comm. Code § 2.306 cmt. 2.

23. As a direct or proximate result of SWEPCO's continuing breaches, Plaintiffs have and will continue to sustain substantial harm.

**B.    Breach of the Implied Duty of Good Faith and Fair Dealing**

24. The contractual duty of good faith and fair dealing arises when a contract creates or governs a special relationship between the parties. Here, the outputs/requirements contract created a special relationship between the parties giving rise to a duty of good faith and fair dealing. *See, e.g., Johnson v. Peckham*, 120 S.W.2d 786, 791 (Tex. 1938) (partner purchasing other's partnership owes "the highest duty of honesty and fair dealing in making the trade").

Page **8** of **19**

TRUE AND CORRECT COPY

25.     SWEPCO breached this duty of good faith and fair dealing based on the actions and inactions set forth above.

26.     As a direct or proximate result of SWEPCO's continuing breaches, Plaintiffs have and will continue to sustain substantial harm.

**C.     Declaratory Judgment**

27.     A justiciable controversy exists between Plaintiffs and SWEPCO; therefore, Plaintiffs request a declaratory judgment pursuant to TEX. CIV. PRAC. & REM. CODE § 37.003. Plaintiffs therefore seek an order declaring the parties' rights, duties, restrictions, and liabilities under the Agreement.  In particular, Plaintiffs seek an order declaring that SWEPCO does not have the right or authority under the Agreement to shutter the Pirkey Power Plant in 2023 or otherwise commence activities related to the closure and destruction of the Pirkey Power Plant and equipment and facilities within the Pirkey Power Plant.

**VII.**
**CONDITIONS PRECEDENT**

28.     All conditions precedent to Plaintiffs' claims for relief have been performed or have occurred or have been waived.

**VIII.**
**APPLICATION FOR INJUNCTIVE RELIEF**

29.     Plaintiffs incorporate herein by reference the allegations set forth in the preceding paragraphs.

30.     Pursuant to Tex. R. Civ. P. 680, Plaintiffs seek a temporary restraining order ("TRO") and temporary injunction ("TI") against SWEPCO to maintain the status quo during the pendency of this lawsuit and to enjoin certain conduct.  This application for a TRO and

Page **9** of **19**

TRUE AND CORRECT COPY

TI is supported by the Verification of Andrew Hawbaker and made pursuant to TEX. R. CIV. P. 680 and 682. *See* <u>Exhibit 4</u>.

## A.  Grounds for Issuing TRO and TI.

31.     TROs and TIs serve to maintain the status quo between the parties during the pendency of a lawsuit, where the "[s]tatus quo is the last, actual, peaceable, non-contested status that preceded the pending controversy." *See, e.g., Surko Enters., Inc. v. Borg-Warner Acceptance Corp.*, 782 S.W.2d 223, 224 (Tex. App.—Houston [1st Dist.] 1989, no writ) (internal quotations omitted). To obtain a TRO or TI, Plaintiffs need only to: (a) plead a cause of action against the party to be restrained; (b) show a probable right to recover on that cause of action; and (c) show that a probable, imminent, and irreparable injury for which there is no adequate remedy at law will occur in the interim. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). Thus, Plaintiffs need only to "produce evidence tending to prove a probable right to recovery on the merits and a probable injury if the injunction is not granted." *El Paso Dev. Co. v. Berryman*, 729 S.W.2d 883, 886 (Tex. App.—Corpus Christi 1987, no writ).

32.     Plaintiffs' application for TRO and TI is authorized by TEX. CIV. PRAC. & REM. CODE §§ 65.011(1) & 65.011(3). Section 65.011(1) authorizes an injunction if "the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant." TEX. CIV. PRAC. & REM. CODE § 65.011(1). Section 65.011(3) authorizes an injunction if "the applicant is entitled to a writ of injunction under the principles of equity and the laws of Texas relating to injunctions." *Id.* § 65.011(3).

TRUE AND CORRECT COPY

**B.   Plaintiffs Have Shown Breaches by SWEPCO and a Likelihood of Success on the Merits.**

33.    As set forth in the foregoing paragraphs, all of which are incorporated herein by reference, SWEPCO has breached its contract with Sabine as well as its implied duty of good faith and fair dealing.  The terms of the Lignite Mining Agreement and the history of the relationship between Plaintiffs and SWEPCO show that the Agreement imposes an obligation on SWEPCO to remain in the business of running a coal-fired power plant through the term of the agreement.  The earliest recitals of the original 1981 agreement between Sabine and SWEPCO reflect that Sabine was tasked "to design, develop, construct, and operate by surface mining techniques a lignite mine" for the sole purpose of supplying fuel to the Pirkey Power Plant.  Throughout the lengthy term of the parties' relationship, the agreement has been amended and restated many times, including most recently in 2008, when the parties set an end term of 2035.  Ample law supports the conclusion that the Agreement imposes an obligation on the parties to remain in business until then.  *See, e.g., Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1356-57 (10th Cir. 1989) (holding that requirements contract imposed obligation to "remain in business and maintain requirements throughout the term of the contract," and basing decision on factors including the fact that "the all-requirements contract and the entire enterprise of the parties in this case are based on the continuance of the contract throughout the agreed-upon term"); *Feld v. Henry S. Levy & Sons, Inc.*, 335 N.E.2d 320, 323 (N.Y. 1975) (holding that contract participant's "duty to remain in [ ] production is a matter calling for a close scrutiny of its motives"); *407 E. 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 24 N.E.2d 37, 40 (N.Y. 1968) ("Such a promise to remain in business will be implied particularly where the promisee has undertaken certain burdens or

Page **11** of **19**

TRUE AND CORRECT COPY

obligations in expectation of and reliance upon the promisor's continued activity."); *Central States Power & Light Corp. v. U.S. Zinc. Co.*, 60 F.2d 832, 834 (10th Cir. 1932) ("The defendant owning an established business had the implied obligation to continue it in the usual manner, and accept during the time fixed the gas required to so conduct it. . . . [Defendant's] contentions come to this: That it was agreed defendant might quit operating the smelter and end liability; in other words, the plaintiff was to go to great expense in preparation to deliver the gas, but the defendant was not obligated to take it for any definite time, with the result that, if defendant could be rid of the obligation at the end of the period of operation, it could likewise avoid it in one month or one day. Surely this would be a most unreasonable interpretation of the contract."); *Diamond Alkali Co. v. P. C. Tomson & Co.*, 35 F.2d 117, 119-20 (3d Cir. 1929) ("The fact that the contract did not in express terms say that the defendant would continue in business for five years did not relieve it from performing their mutual intention as indicated by the express covenants, and in order to do so, it had to continue in business.").

34.     SWEPCO's decision to close Pirkey Power Plant in order to switch to electricity produced by wind and solar power is an attempt to avoid the terms of the Agreement. That is not commercial good faith. Section 2-306 of the UCC (codified at Tex. Bus. & Com. Code § 2.306) provides that the quantity term in requirements contracts "means such actual output or requirements as may occur in good faith." Comment 2 of Section 2-306 specifically addresses shutdowns, or reductions to zero:

> Under this Article, a contract for output or requirements is not too indefinite since it is held to mean the actual good faith output or requirements of the particular party. Nor does such a contract lack mutuality of obligation since, under this section, the party

Page **12** of 19

TRUE AND CORRECT COPY

> who will determine quantity is required to operate his plant or conduct his business in good faith and according to commercial standards of fair dealing in the trade so that his output or requirements will approximate a reasonably foreseeable figure . . . . A shut-down by a requirements buyer for lack of orders might be permissible when a shut-down merely to curtail losses would not. The essential test is whether the party is acting in good faith.

*See, e.g., Northern Natural Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 608 (Tex. 1998) ("[A] party who seeks to avoid performance of an output contract by having no output -- or of a requirements contract by having no requirements -- may not do so in bad faith."); *Metal One Am., Inc. v. Ctr. Mfg., Inc.*, No. 1:04-cv-431, 2005 U.S. Dist. LEXIS 40304, at *19 (W.D. Mich. July 14, 2005) ("[Because [defendant] shut down the plant to 'curtail losses,' [defendant] breached the contract in bad faith as a matter of law.").

35. Numerous courts have addressed this requirement of "good faith," with many cases looking to Judge Posner's analysis in *Empire Gas Corp. v. American Bakeries Co.*, 840 F.2d 1333 (7th Cir. 1988), which found that the buyer acted in bad faith. In *Empire Gas*, the court held that good faith requires a buyer to show "a business reason" for ceasing purchases "that was independent of the terms of the contract or any other aspect of its relationship with [the seller], such as a drop in the demand for its [end] products." *Id.* at 1339. "The essential ingredient of good faith in the case of the buyer's reducing his estimated requirements is that he not merely have had second thoughts about the terms of the contract and want to get out of it. . . . [This standard] requires at a minimum that the reduction not have been motivated solely by a reassessment of the balance of advantages and disadvantages under the contract to the buyer." *Id.* at 1340-41.

TRUE AND CORRECT COPY

36.     SWEPCO's fuel-supply needs have not been eliminated, but SWEPCO has "reassessed the balance of advantages and disadvantages under" the Agreement and decided that it now wants power from different sources at different prices, and aims to accomplish that goal by avoiding its existing power-supply contract.  In effect, SWEPCO is shuttering Pirkey Power Plant merely to acquire a substitute product: electric generation from a different source.  In the context of requirements contracts, that is classic bad faith.  *See, e.g., Vulcan Materials Co. v. Atofina Chems. Inc.*, 355 F. Supp. 2d 1214, 1234-36 (D. Kan. 2005) (closing plant in order to obtain key chemical input at cheaper costs from other suppliers); *Structural Polymer Grp., Ltd. v. Zoltek Corp.*, 543 F.3d 987, 994 (8th Cir. 2008) (breach of requirements contract to purchase "an interchangeable product from a third party"); *Empire Gas*, 840 F.2d at 1341; W. Oil & Fuel Co. v. Kemp, 245 F.2d 633, 638 (8th Cir. 1957); S*w. Natural Gas Co. v. Okla. Portland Cement Co.*, 102 F.3d 630, 633 (10th Cir. 1939) (buyer's decision to reduce requirements by substituting "a new or different fuel" would be bad faith).  As a result, Plaintiffs are likely to recover on their causes of action.

C.     **Absent the Requested Injunctive Relief, Plaintiffs Will Suffer Imminent and Irreparable Harm for Which No Adequate Remedy at Law Exists.**

37.     As set forth above, the harm that will be caused by the destruction and reclamation of the Pirkey Power Plant is imminent and irreparable.

38.     The sole customer for the Sabine Mining Company is the Pirkey Power Plant. By continuing decommissioning, deconstruction, and demolition activities at the plant, as well as certain reclamation activities at Sabine Mine, SWEPCO will cause the Sabine Mining Company to lose its only source of coal sales and therefore its only business opportunity now and in the future.

Page **14** of **19**

TRUE AND CORRECT COPY

39.     Not only will the destruction of plant equipment make it difficult if not impossible to resume normal plant operations in the event SWEPCO's decision to close the plant is deemed imprudent.  Moreover, SWEPCO's activities will cause physical and regulatory hurdles that will make the economics of restarting the plant impossible.  To the extent that SWEPCO's activities are not halted and the plant ultimately restarts, SWEPCO likely would attempt to secure ratepayer reimbursement of the costs associated with remedying SWEPCO's activities.

**D.     The Balancing of the Equities, Including the Public Interest, and Maintenance of the Status Quo Justifies Issuance of the Injunctive Relief.**

40.     It is in the best interest of the public to retain the Pirkey Power Plant as an operational power plant from a financial, flexibility, and reliability standpoint.

41.     First,  with continued operation of the Pirkey Power Plant, SWEPCO would have no need for any additional short-term capacity agreements with third parties in 2023 and beyond.  Pirkey Power Plant's operating capacity of 720 MW of dispatchable capacity can provide customers with enhanced reliability at a predicable cost during extreme weather events—something these short-term capacity agreements will not be able to provide. Retaining the Pirkey Power Plant and its dependable capacity also provides SWEPCO additional flexibility in building or acquiring new renewable capacity over the next few years.

42.     Retaining operational ability of the Pirkey Power Plant will also retain valuable permanent jobs in Harrison County and provide additional time for the workforces at the power plant and nearby mine to transition into other employment. At least 107 people were employed at the power plant, while another roughly 172 people were employed at the Sabine

Page **15** of **19**

coal mine. Overall, the Pirkey Power Plant in operation supports almost 300 direct jobs in Harrison County and a multitude of related additional jobs in Harrison County.

43.   Besides being two of the largest employers in Harrison County, the Pirkey Power Plant and the Sabine coal mine are also two of the largest taxpayers in Harrison County. These largest tax revenue contributors support local public programs and account for a large amount of funding for schools, libraries, police, and first responders' budgets. SWEPCO wants to prematurely terminate the employment of loyal mine and plant employees and cutoff the tax revenue—when it might not be necessary at all, and for reasons that are not prudent and also in violation of the Agreement.

44.   On the other hand, SWEPCO is not likely to be prejudiced by an injunction. There is no demonstrable harm to pausing any and all demolition and reclamation work that would disable the plant or cause undue economic burden to restarting the plant until the underlying dispute between the parties is fully and finally resolved. Thus, the balancing of the harm and the public interest favors the issuance of the requested temporary restraining order and temporary injunction.

**E.    Requested Relief.**

45.   For all the foregoing reasons, Plaintiffs seek a temporary restraining order and temporary injunction enjoining SWEPCO, and those acting in concert with SWEPCO, from and requiring that:

   a.   Defendant be enjoined from destroying, removing or demolishing any equipment located at the Pirkey Power Plant;

   b.   Defendant be enjoined from beginning, commissioning, or performing any reclamation activities that that may cause physical, financial, or regulatory harm or impediments to the ability to restart the Sabine Mine; and

Page **16** of 19

TRUE AND CORRECT COPY

        c.  Defendant be further enjoined from any other activities that may cause physical, financial, or regulatory harm or impediments to the ability to restart the Pirkey Power Plant.

46.     Attached as <u>Exhibit 5</u> to this Application is a proposed Temporary Restraining Order incorporating the terms immediately above.

## F.    Bond.

47.     Plaintiffs are willing to post bond in an amount the Court deems appropriate to protect SWEPCO from any harm it may sustain as a result of the temporary relief requested herein. *See* Tex. R. Civ. P. 680. But given the circumstances of this case, SWEPCO's misconduct, and the status quo, Plaintiffs respectfully ask the Court to exercise its discretion in such a manner that would only require Plaintiffs to post a bond of nominal amount. *See El Paso Dev. Co.*, 729 S.W.2d at 888-89 (while the bond amount must have some relation to the potential damages in this lawsuit, a $15,000 bond was adequate for a debt of over $7 million because there was sufficient collateral). Plaintiffs also respectfully request that they be permitted to post a cash deposit in lieu of bond.

## IX.
## MOTION FOR EXPEDITED DISCOVERY

48.     Plaintiffs also request that the Court allow them to take expedited discovery from SWEPCO on issues pertaining to Plaintiffs' request for a temporary injunction. For the purposes of the temporary injunction hearing, Plaintiffs seek discovery of additional evidence relating to SWEPCO's activities and justification for commencing unauthorized demolition and reclamation activities. Accordingly, Plaintiffs request leave to immediately serve no more than ten (10) requests for production and five (5) interrogatories to SWEPCO, and that the

TRUE AND CORRECT COPY

Court order SWEPCO to serve their responses within five (5) days of service. Plaintiffs also request leave to immediately depose a corporate representative of SWEPCO.

## X.
## ATTORNEY'S FEES

49.     SWEPCO's actions have made it necessary for Plaintiffs to obtain the services of the undersigned attorneys for enforcement of their rights.  Therefore, Plaintiffs are entitled to reasonable attorneys' fees under TEX. CIV. PRAC. & REM. CODE § 38.001 and § 37.009.

## XI.
## PRAYER

WHEREFORE, PLAINTIFFS The Sabine Mining Company and the North American Coal Corporation request that Defendant Southwestern Electric Power Company be cited to appear and answer, and respectfully requests that this Court award:

a.  Injunctive relief as requested above, first in the manner of a temporary restraining order, then as a temporary injunction;

b.  Judgment against Defendant for a sum for actual damages to be proven in this litigation;

c.  Costs and attorneys' fees;

d.  Prejudgment and post-judgment interest as provided by law; and

e.  Such other and further relief, at law or in equity, to which Plaintiffs may be justly entitled.

TRUE AND CORRECT COPY

Respectfully submitted,

**JACKSON WALKER L.L.P.**

By: */s/ Scott W. Weatherford*
    Scott W. Weatherford
    State Bar No. 24079554
    sweatherford@jw.com
    100 Congress Avenue, Suite 1100
    Austin, Texas  78701
    (512) 236-2000
    (512) 236-2002 – Fax

    **ATTORNEYS FOR PLAINTIFFS**

TRUE AND CORRECT COPY

# EXHIBIT 1

TRUE AND CORRECT COPY

# THIRD RESTATEMENT OF

# LIGNITE MINING AGREEMENT

### BETWEEN

### SOUTHWESTERN ELECTRIC POWER COMPANY

### AND

### THE SABINE MINING COMPANY

### Effective as of January 1, 2008

NOTICE:    THIS CONTRACT IS SUBJECT TO ARBITRATION UNDER THE TEXAS

GENERAL ARBITRATION ACT.

g:\lega\\sabine\3rd rstmt\3rd rstmt final 12-19-08.doc

TRUE AND CORRECT COPY

## CONTENTS

| | | Description | Page |
|---|---|---|---|
| ARTICLE | I. | Definitions | 4 |
| ARTICLE | II. | Term | 7 |
| ARTICLE | III. | Scope of Engagement | 8 |
| ARTICLE | IV. | Development and Operation of the Mine | 9 |
| ARTICLE | V. | Quantity and Scheduling | 14 |
| ARTICLE | VI. | Delivery | 16 |
| ARTICLE | VII. | Quality and Recovery | 16 |
| ARTICLE | VIII. | Loan and Lease Obligations | 18 |
| ARTICLE | IX. | Compensation | 20 |
| ARTICLE | X. | Sampling and Analysis; Weights | 32 |
| ARTICLE | XI. | Mine Closing Costs | 35 |
| ARTICLE | XII. | Billing and Accounts | 36 |
| ARTICLE | XIII. | Reports and Audit | 38 |
| ARTICLE | XIV. | Force Majeure | 40 |
| ARTICLE | XV. | Conduct of Operations | 42 |
| ARTICLE | XVI. | Insurance | 43 |
| ARTICLE | XVII. | Relationship of the Parties | 46 |
| ARTICLE | XVIII. | Arbitration | 48 |
| ARTICLE | XIX. | SABINE Default; Remedy | 51 |
| ARTICLE | XX. | Termination of Relationship | 55 |

g:\legal\sabine\3rd rlaw\3rd rlmu final 12-19-08.doc

TRUE AND CORRECT COPY

# CONTENTS CONTINUED

| | | Description | Page |
|---|---|---|---|
| ARTICLE | XXI. | Notices and Other Communications; Designated Representatives | 59 |
| ARTICLE | XXII. | Right of Inspection | 60 |
| ARTICLE | XXIII. | Limitations of SABINE Functions | 61 |
| ARTICLE | XXIV. | Assignment | 61 |
| ARTICLE | XXV. | Interpretation | 62 |
| ARTICLE | XXVI. | Severability | 62 |
| ARTICLE | XXVII. | Entire Agreement | 63 |
| ARTICLE | XXVIII. | Amendments | 63 |
| ARTICLE | XXIX. | Counterparts | 63 |
| ARTICLE | XXX. | Waiver of Remedies | 64 |
| ARTICLE | XXXI. | Representations, Warranties and Covenants | 64 |
| ARTICLE | XXXII. | Short Form Supplement | 67 |
| ARTICLE | XXXIII. | Equal Employment Opportunity | 67 |
| | | Signature Page | 68 |
| | | Supplement A- Certification for Employment Opportunities Programs for Minorities and Veterans | |

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

## CONTENTS CONTINUED

EXHIBITS:

|           |                                                                                                  |
|-----------|--------------------------------------------------------------------------------------------------|
| Exhibit "A" | Plat of South Hallsville No. 1 Reserves, South Marshall Reserves, Rusk Reserves and Norit Mine Area |
| Exhibit "B" | Management Fee Escalation Example                                                               |
| Exhibit "C" | Post-Production Period Management Fee Schedule                                                  |
| Exhibit "D" | General and Administrative Costs Adjustment Examples                                            |
| Exhibit "E" | Invoice Calculation Procedure for Lignite Delivered by SABINE for Use at SWEPCO's Plant         |
| Exhibit "F" | Post-Production Period General and Administrative Costs Schedule                                |
| Exhibit "G" | Example Calculation of Termination Fee                                                          |

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\cabinet\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

# THIRD RESTATEMENT OF
# LIGNITE MINING AGREEMENT

## NOTICE: THIS CONTRACT IS SUBJECT TO ARBITRATION UNDER THE TEXAS GENERAL ARBITRATION ACT

THIS AGREEMENT is made and entered into as of January 1, 2008 by and between SOUTHWESTERN ELECTRIC POWER COMPANY, a Delaware corporation (hereinafter referred to as "SWEPCO"), and THE SABINE MINING COMPANY, a Nevada corporation (hereinafter referred to as "SABINE"), a wholly-owned subsidiary of The North American Coal Corporation, a Delaware corporation, SABINE being incorporated for the sole and single purpose of performing the services, functions, duties and obligations stated herein to be performed by SABINE.

## W I T N E S S E T H:

WHEREAS, SWEPCO operates and has an ownership interest in a lignite-fired electric generating station called Henry W. Pirkey Unit No. 1 (hereinafter referred to as "SWEPCO's Plant") near Hallsville, Texas, having an approximate net generating capacity of 650 megawatts; and

WHEREAS, SWEPCO owns or controls (by lease, fee ownership or otherwise) certain lignite reserves located near SWEPCO's Plant, which may (at SWEPCO's election) be all or part of the source of the lignite supply for SWEPCO's Plant or which may be utilized for any other purposes, and lignite removed therefrom may be used at any other locations desired by SWEPCO; and

3ᴿᴰ RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

1    WHEREAS, SWEPCO and SABINE are parties to a Lignite Mining Agreement

2    dated as of January 1, 1981, as amended (the "Lignite Mining Agreement"); and

3    WHEREAS, pursuant to the Lignite Mining Agreement, SWEPCO engaged

4    SABINE to design, develop, construct and operate in the South Hallsville No. 1

5    Reserves (as hereinafter defined) a lignite mine having a productive capacity sufficient

6    to supply the lignite requested by SWEPCO within the quantity and quality limits

7    provided for in that agreement; and

8    WHEREAS, SWEPCO conducted its evaluation of the various future fuel options

9    for SWEPCO's Plant (the "Pirkey Fuel Study"), which options included the use of sub-

10   bituminous coal mined and delivered to SWEPCO's Plant from the Powder River Basin

11   Area of Wyoming, the continued mining of the South Hallsville No. 1 Reserves pursuant

12   to the Lignite Mining Agreement, and the proposal of SABINE (the "Proposal") to modify

13   the Lignite Mining Agreement to include within the lignite reserves upon which SABINE

14   is authorized to conduct mining operations certain other lignite reserves controlled by

15   SWEPCO but not covered by the Lignite Mining Agreement (the "South Marshall

16   Reserves", as hereinafter defined); and

17   WHEREAS, SWEPCO concluded pursuant to the Pirkey Fuel Study that an

18   amendment to and restatement of the Lignite Mining Agreement which authorizes

19   SABINE to conduct lignite surface mining operations in the South Marshall Reserves

20   pursuant to the Proposal currently is the most economical fuel option for SWEPCO's

21   Plant; and

22   WHEREAS, the parties by the Restatement of Lignite Mining Agreement dated

23   as of January 1, 1996 (the "RLMA") made certain amendments in the Lignite Mining

2

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

1    Agreement so as to authorize SABINE to design, develop, construct and operate

2    facilities to mine lignite in the South Marshall Reserves in accordance with the Proposal

3    and the Pirkey Fuel Study and in a manner which permits an orderly and economic

4    cessation of the mining operations in the South Hallsville No. 1 Reserves; and

5              WHEREAS, the parties entered into amendments to the RLMA dated as of

6    October 1, 1998; November 1, 1999; January 6, 2000 and letter agreements dated as of

7    March 2, 1998, and February 9, 2000, amending the RLMA; and

8              WHEREAS, the parties by the Second Restatement of Lignite Mining Agreement

9    dated as of December 1, 2001 restated the Lignite Mining Agreement again to

10   incorporate such amendments and letter agreements into a single document, to provide

11   for invoice normalization and the addition of the Norit Mine Area, and to make certain

12   other changes to the RLMA;

13             WHEREAS, the parties by this instrument desire to restate the Lignite Mining

14   Agreement again to include within the lignite reserves upon which SABINE is authorized

15   to conduct mining operations certain other lignite reserves controlled by SWEPCO but

16   not covered by the Second Restatement of Lignite Mining Agreement (the "Rusk

17   Reserves", as hereinafter defined), and to make certain other changes to the RLMA;

18   NOW, THEREFORE, in consideration of the foregoing and the covenants and

19   agreements of the parties as herein set forth, the following Third Restatement of Lignite

20   Mining Agreement hereby is adopted as an amendment and restatement of the Lignite

21   Mining Agreement.

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2006

g:\legal\sabine\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

1  **ARTICLE I**
2  **Definitions**

3       For the purposes of this Agreement, the following terms shall have the following

4  meanings:

5       (a)    "AAA" shall mean the American Arbitration Association.

6       (b)    "AAA Rules" shall mean the Commercial Arbitration Rules of the AAA, as
7  from time to time amended and in effect.

8       (c)    "Affiliate of SABINE" shall mean a party or person owning fifty percent
9  (50%) or more of the common stock of SABINE or otherwise controlling SABINE or
10  controlled by or under common control with SABINE.

11      (d)    "Annual Mining Plan" shall have the meaning set forth in **Article IV,**
12  **Section 2 (b)**.

13      (e)    "Agreement" shall mean this Third Restatement of Lignite Mining
14  Agreement.

15      (f)    "As-delivered, as-received" shall mean the projected quality or the actual
16  quality, as the case may be, of the mined lignite at the point of delivery to SWEPCO on
17  an "as-received" moisture basis.

18      (g)    "As-received" moisture basis shall have the meaning, as applicable, set
19  forth in ASTM Standards D2013, D3173 and D3180.

20      (h)    "ASTM" shall mean the American Society for Testing and Materials.

21      (i)    "Btu" shall mean a Standard British Thermal Unit.

22      (j)    "Business Day" shall mean any calendar day other than a Saturday,
23  Sunday or other day on which banks in New York City or Texas are required or
24  authorized to be closed.

25      (k)    "Cost of Production" shall have the meaning set forth in **Article IX,**
26  **Section 2(a).**

27      (l)    "Deferred Development Costs" shall have the meaning set forth in
28  **Article IX, Section 1(a).**

29      (m)    "Designated Representative" shall have the meaning set forth in
30  **Article XXI.**

31      (n)    "Development Period" shall mean, with respect to the development of any
32  area of the Mine, the period from the date of SWEPCO's written approval of the

4                                      3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
                                                   EFFECTIVE JANUARY 1, 2008

TRUE AND CORRECT COPY

1    Deferred Development Costs with respect to such area until such date that SWEPCO
2    shall designate.

3    (o)    "Emergency" shall mean a sudden and unexpected occurrence at the
4    Mine, the nature of which requires prompt action in order to preserve or protect life or
5    property, prevent damage, maintain production, or comply with any applicable law, rule
6    or regulation and where there is not sufficient time for SABINE to notify SWEPCO of
7    such occurrence and obtain advance approval of such remedial or preventive action.

8    (p)    "Force Majeure" shall have the meaning set forth in **Article XIV.**

9    (q)    "Laboratory" shall mean the laboratory which is used by SWEPCO to
10   analyze the lignite samples taken by SWEPCO in accordance with the provisions of
11   **Article X, Section 1.**

12   (r)    "Life of Mine Plan" shall mean the Mining Plan covering life of mine
13   requirements described in **Article IV, Section 2(a).**

14   (s)    "Loan and Lease Obligations" shall mean all obligations of SABINE
15   incurred in connection with loans, leases, extensions of credit and other financial
16   arrangements entered into by SABINE with SWEPCO's advance approval and
17   necessary for, but not limited to, the design, development, construction, equipment,
18   operation and maintenance of the Mine to the capacity required for producing quantities
19   of lignite to be furnished to SWEPCO under this Agreement, whether the same shall
20   become due and owing during the term hereof or otherwise, including fees, if any,
21   interest, rentals, late payment penalties, indemnification payments, and all payments
22   arising as a result of any termination, premature or otherwise, or any default under any
23   such financial arrangements or the agreement or agreements embodying the same.

24   (t)    "Management Fee" shall have the meaning set forth in **Article IX,
25   Section 2 (c).**

26   (u)    "Mine" shall mean the mine developed, constructed and operated by
27   SABINE in SWEPCO's Reserves.

28   (v)    "Mining Plan" shall mean the Life of Mine Plan and/or Annual Mining Plan
29   approved by SWEPCO as provided in **Article IV** of this Agreement, as revised and
30   expanded pursuant to such **Article IV.**

31   (w)    "mmBtus" shall mean one million Btus on an "as-delivered, as-received"
32   basis.

33   (x)    "North American Coal" shall mean The North American Coal Corporation
34   (formerly called Nortex Mining Company), a Delaware corporation.

35   (y)    "Norit" shall mean Norit Americas, Inc., a Georgia corporation.

36   (z)    "Norit Mine Area" shall mean the area so delineated in **Exhibit "A".**

5                    3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
                          EFFECTIVE JANUARY 1, 2008

g:\legal\unit\cost\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

(aa) "Norit Tons" shall mean Tons of lignite mined by SABINE and delivered into trucks supplied by Norit, its agents or contractors, which quantity shall be no less than 225,000 TPY and no greater than 650,000 TPY.

(bb) "Option Agreement" shall mean, collectively, that certain Option Agreement, dated as of January 15, 1981, by and among North American Coal, SWEPCO, and Texas Commerce Bank-Longview, National Association (or their respective predecessors-in-interest), as amended by the following: (1) Addendum to Option Agreement, dated as of January 15, 1981, by and among North American Coal, SWEPCO, and Texas Commerce Bank-Longview, National Association (or their predecessors-in-interest), (2) Agreement, dated as of June 30, 1988, by and among North American Coal, SWEPCO, Texas Commerce Bank-Longview, National Association, SABINE, and North American Coal (or their respective predecessors-in-interest), (3) Amendment to Option Agreement, dated as of December 2, 1996, by and among North American Coal, SWEPCO, and Longview National Bank, and (4) Second Amendment to Option Agreement, dated as of <u>January 1, 2008</u>, by and among North American Coal, SWEPCO, and Regions Bank.

(cc) "Pirkey Fuel Study" shall have the meaning set forth in the fifth "WHEREAS" clause of this Agreement.

(dd) "Post-Production Management Fee" shall have the meaning set forth in **Article IX, Section 3.**

(ee) "Post-Production Period" shall mean the period from the date on which the Production Period ends until the end of the term of this Agreement.

(ff) "Production Period" shall mean the period from January 1, 1996 until the mining and delivery of lignite to SWEPCO hereunder ceases and the final Mine closing and Post-Production Period reclamation commences.

(gg) "Proposal" shall have the meaning set forth in the fifth "WHEREAS" clause of this Agreement.

(hh) "Recovery Period" shall mean the period(s) of time designated by SWEPCO over which the Deferred Development Costs for each Development Period are to be repaid by SWEPCO to SABINE in the Cost of Production.

(ii) "SABINE Default" shall have the meaning set forth in **Article XIX, Section 1.**

(jj) "SABINE Qualifying Force Majeure Event" shall mean each event of Force Majeure experienced by SABINE during a calendar year which has a duration greater than three (3) calendar days.

(kk) "South Hallsville No. 1 Reserves" shall mean the lignite reserves so designated in **Exhibit "A"** attached hereto and made a part hereof that are located from

6

g:\lega\sabine\3rd rlma\3rd rlma (inal 12-19-08.doc


TRUE AND CORRECT COPY

the surface to a depth of 200 feet below the surface and are owned by, leased to, or
otherwise controlled by SWEPCO and shall also mean any additional economically
surface mineable lignite to such 200 foot depth which SWEPCO hereafter acquires
within the South Hallsville No. 1 Reserves area delineated in **Exhibit "A."** At
SWEPCO's option, the 200 foot depth limitation may be extended to a greater depth.

(ll)  "South Marshall Reserves" shall mean the lignite reserves so designated
in **Exhibit "A"** attached hereto and made a part hereof that are located from the surface
to a depth of 200 feet below the surface and are owned by, leased to, or otherwise
controlled by SWEPCO, including the Norit Mine Area, and shall also mean any
additional economically surface mineable lignite to such 200 foot depth which SWEPCO
hereafter acquires within the South Marshall Reserves area delineated in **Exhibit "A."**
At SWEPCO's option, the 200 foot depth limitation may be extended to a greater depth.

(mm) "Rusk Reserves" shall mean the lignite reserves so designated in
**Exhibit "A"** attached hereto and made a part hereof that are located from the surface to
a depth of 200 feet below the surface and are owned by, leased to, or otherwise
controlled by SWEPCO and shall also mean any additional economically surface
mineable lignite to such 200 foot depth which SWEPCO hereafter acquires within the
Rusk Reserves the area delineated in **Exhibit "A."** At SWEPCO's option, the 200 foot
depth limitation may be extended to a greater depth.

(nn)  "SWEPCO's Reserves" shall mean collectively the South Hallsville No. 1
Reserves, the South Marshall Reserves and the Rusk Reserves.

(oo)  "Ton" shall mean a net ton of 2,000 pounds.

(pp)  "Total Compensation" shall mean the total amount paid each year during
the Production Period to SABINE pursuant to **Article IX, Section 2**.

(qq)  "TPY" shall mean Tons per year.

(rr)  "Uniform Rounding Practice" shall mean as follows: when the number to
the right of the relevant number is four (4) or less, the relevant number shall remain
unchanged.  When the number to the right of the relevant number is five (5) or more,
the relevant number shall be increased to the next higher number.

## ARTICLE II
### Term

This Agreement shall commence on the date hereof and shall remain in effect (a)

(i) until 2035 and (ii) thereafter until the Mine has been closed, the reclamation work has

been completed, the permit bonds have been released, and the permit to mine has

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd r\fina\l\3rd r\fina final 12-19-08.doc

TRUE AND CORRECT COPY

1    been satisfied by successful completion of all reclamation operations in accordance with

2    the approved Mining Plan, or (b) until such earlier time that this Agreement might expire

3    or be terminated as provided herein.

4          The termination or expiration of this Agreement shall not release either party from

5    any obligations, payments or liabilities of such party that accrued during the term of this

6    Agreement or as a result of operations under this Agreement.


7                                    **ARTICLE III**
8                              **Scope of Engagement**

9          SWEPCO hereby engages SABINE to continue to design, develop, construct and

10   operate the Mine in accordance with the provisions of this Agreement, and SABINE

11   hereby accepts such engagement and undertakes to use its best efforts, best

12   management and mining skills and best engineering and business judgments to perform

13   its obligations under this Agreement for the compensation herein specified.   SABINE

14   shall design, develop, construct and operate the Mine as hereinafter provided and shall

15   furnish, subject to SWEPCO's approval, all engineering, permitting, geological,

16   operating, administrative and supervisory services and personnel necessary therefor.

17   SABINE shall be responsible for preparing, processing, obtaining and shall use its best

18   efforts to comply with the conditions of all permits required in connection with the

19   operations contemplated hereby.   After first obtaining SWEPCO's approval of any

20   proposed permit application, exhibits thereto and related documents, SABINE shall

21   process the same in the name of SABINE.

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

1                                **ARTICLE IV**

2            **Development and Operation of the Mine**

3     **Section 1. <u>General</u>**

4          The design, development, construction and operation of the Mine shall consist of

5     one or more Development Periods, a Production Period and a Post-Production Period.

6          During each Development Period, SABINE shall design, engineer, develop and

7     construct the Mine in SWEPCO's Reserves.

8          During the Production Period, SABINE shall operate the Mine and perform all

9     engineering, geological, operational, administrative and other work required or

10    requested by SWEPCO to supply lignite to SWEPCO under this Agreement.

11         During the Post-Production Period, SABINE shall perform all work and services

12    required or requested by SWEPCO in connection with the final closing of the Mine and

13    completion of final reclamation work.  SWEPCO shall have the right at its election at any

14    time during the Post-Production Period (with or without cause) to take over and conduct

15    or complete the Post-Production work by the acquisition by SWEPCO of all the capital

16    stock of SABINE pursuant to the Option Agreement after giving SABINE notice thereof,

17    which notice shall be given at least 365 days in advance.  During such notice period

18    SABINE shall fully cooperate regarding the orderly transfer of operations.

19         SABINE shall have the right to employ consulting organizations approved by

20    SWEPCO to provide engineering, design, environmental and other work required for

21    SABINE to perform its obligations under this Agreement.  Further, all charges of such

22    consulting organizations not included in the Approved Annual Mining Plan must be

23    approved in writing by SWEPCO.

TRUE AND CORRECT COPY

1   Section 2.  **Mine Development**

2       **(a)**    **Life of Mine Plan.**

3       SABINE has provided to SWEPCO in writing a mining plan covering life of Mine

4   requirements ("Life of Mine Plan") for the design, development, construction and

5   operation of the Mine to furnish from SWEPCO's Reserves the lignite requirements

6   requested by SWEPCO under the provisions of **Article V** hereof for the period 2008

7   through 2035.  The Life of Mine Plan is in accordance with sound engineering and

8   design practices and applicable laws, rules and regulations and shall include, but not be

9   limited to, production schedules, manpower and equipment requirements, estimated

10  costs per ton and per mmBtus, time schedules for mine development, method of

11  operation, including method of operation of any coal handling facilities, reclamation and

12  permitting schedules, capital expenditures and operating cost requirements, mine

13  design, mine projection maps, mine progression and reserve studies, and other

14  documentation requested by SWEPCO.

15      On or before October 1 of each calendar year, SABINE shall review and revise or

16  expand, if necessary, the Life of Mine Plan based on the then current designation of

17  annual deliveries provided by SWEPCO in the notice given pursuant to **Section 3** of

18  **Article V** hereof.  SABINE, at a minimum, shall emphasize and set forth in specific

19  detail in such revised Life of Mine Plan the next five (5) years of mining operations.

20      **(b)**    **Annual Mining Plan.**

21      On or before October 1 of each calendar year during the term of this Agreement,

22  SABINE shall provide to SWEPCO in writing a mining plan covering the operation of the

23  Mine for the next calendar year ("Annual Mining Plan").  Such Annual Mining Plan shall

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine3\rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

1    include, but not be limited to, the following items for activities during the following

2    calendar year:

3            (i)     an estimated capital budget containing estimates of all capital
4                      expenditures and commitments;

5            (ii)    an estimate of all operating costs and expenses in such detail as
6                      SWEPCO may reasonably request; and

7            (iii)   an estimated monthly cash flow statement containing estimates of the
8                      cash requirements for the capital and operating budgets prepared
9                      pursuant to this subsection.

10        The Annual Mining Plan shall also include the details of an incentive

11    compensation plan for SABINE's employees (except for SABINE's employees who are

12    participants in a plan of an Affiliate of SABINE).

13        **(c)**    **Approval of Annual Mining Plan.**

14        Within sixty (60) days after receipt by SWEPCO of an Annual Mining Plan,

15    including the annual capital budgets, SWEPCO shall give SABINE written notice of

16    SWEPCO's approval or disapproval of such Annual Mining Plan and capital budgets.

17    As part of any such approval, SWEPCO shall agree to contribute any item or items of,

18    or interest in, real property and non-depreciable capital assets, and SWEPCO may

19    stipulate that it will contribute any item or items of, or interest in, depreciable capital

20    assets provided for in such Annual Mining Plan and capital budget and thereupon, to

21    the extent necessary or applicable, grant to SABINE sublease rights or other rights to

22    permit SABINE to use the same as long as necessary in lieu of SABINE incurring any

23    expense or obligation with respect thereto. If SWEPCO does not give SABINE such

24    notice within sixty (60) days after SWEPCO's receipt thereof, SWEPCO shall be

25    deemed to have approved such Annual Mining Plan and capital budgets. If SWEPCO

26    disapproves an Annual Mining Plan, capital budgets or any portion(s) thereof, SWEPCO

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

1   shall advise SABINE of the reasons for such disapproval, and SWEPCO and SABINE

2   shall meet promptly and attempt in good faith to resolve their differences with respect to

3   the Annual Mining Plan and/or capital budgets.  If SWEPCO and SABINE are unable to

4   resolve such differences within thirty (30) days after SWEPCO's disapproval, SABINE

5   shall revise and resubmit the Annual Mining Plan and/or capital budgets as requested

6   by SWEPCO.   Under no circumstances shall SABINE acquire any interest in real

7   property or non-depreciable capital assets without the mutual consent of the parties.

8         SABINE shall consult with and keep SWEPCO informed of the progress of the

9   design, construction, development and operation of the Mine in such manner as

10   SWEPCO may reasonably request.

11         In the event that any such annual review of the Annual Mining Plan and any

12   revision, adjustments or modification thereof requested by SWEPCO should delay the

13   final approval thereof by SWEPCO past the beginning of the next calendar year,

14   SABINE shall have the right to continue its operations hereunder pursuant to the last

15   approved capital budget and Annual Mining Plan extended (on a pro rata basis) into the

16   next calendar year until the matter causing such delay has been resolved.

17         SWEPCO and SABINE shall meet at least quarterly (and at such other times as

18   needed or requested by either party) to review the progress of the design, construction,

19   development and operation of the Mine.

20         SABINE shall not make any capital expenditures unless they are generally

21   reflected in a capital budget approved by SWEPCO as part of an Annual Mining Plan or

22   unless otherwise specifically approved by SWEPCO; provided, however, SABINE shall

23   have the right during any calendar year to make capital expenditures required in the

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlmm\3rd rlmm (final) 12-19-08.doc

TRUE AND CORRECT COPY

1    event of an Emergency without advance approval by SWEPCO, provided that SABINE

2    shall make all reasonable efforts to obtain the approval of SWEPCO prior to making any

3    such capital expenditure and if the nature of the Emergency and the time elements

4    involved do not allow sufficient time to obtain SWEPCO's approval of such capital

5    expenditure before it is incurred, SABINE shall subsequently and promptly (but not later

6    than two (2) Business Days after such occurrence) give SWEPCO written notice

7    thereof; and further provided, however, SABINE shall have the right to exceed the

8    amount for any specific capital expenditure (i.e., line item) in any budget approved by

9    SWEPCO by up to five percent (5%) but not more than $100,000.00 in any calendar

10   year without the specific approval of SWEPCO.

11          If SABINE requests approval to exceed an individual capital line item by more

12   than $100,000.00, and if SWEPCO neither approves nor disapproves such request

13   within fifteen (15) days after SWEPCO's receipt thereof, SWEPCO shall be deemed to

14   have approved such request.

15          Except in the event of an Emergency, no material modification of or deviation

16   from the approved Annual Mining Plan shall be made without the written approval of

17   SWEPCO, which approval shall not be unreasonably withheld.  Within two (2) Business

18   Days after the occurrence of any Emergency, SABINE shall notify SWEPCO thereof

19   giving all details including nature, extent and reason for any material modification or

20   deviation from the approved Annual Mining Plan.

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

TRUE AND CORRECT COPY

|   | **ARTICLE V** |
|---|---|
| 1 | |
| 2 | **Quantity and Scheduling** |

3 **Section 1. Quantity**

4        The quantity of mmBtus of lignite to be mined and delivered to SWEPCO for use

5 at SWEPCO's Plant and the quantity of Norit Tons to be mined and delivered shall be

6 the quantities requested by SWEPCO in accordance with the provisions of this

7 Agreement; provided, however, the quantity of mmBtus of lignite and the quantity of

8 Norit Tons to be mined and delivered by SABINE shall not exceed the production

9 capability of the Mine; and further provided, however, that when any increase in

10 SWEPCO's mmBtus requirements or in the quantity of Norit Tons occurs which

11 necessitates the acquisition by SABINE of additional equipment, SABINE shall not be

12 obligated to supply any such increased requirements until such time as it is able to

13 acquire and install such additional equipment and do all other things necessary to

14 supply such increased requirements.

15 **Section 2. Rate of Delivery**

16        The delivery of lignite for use at SWEPCO's Plant shall be made in monthly

17 quantities which approximate the monthly utilization of lignite at SWEPCO's Plant, or as

18 otherwise directed by SWEPCO.   The delivery of Norit Tons shall be made in

19 approximately equal monthly quantities or as otherwise directed by SWEPCO.

20 **Section 3. Designation of Annual Deliveries**

21        No later than August 1 of each year during the term of this Agreement, SWEPCO

22 shall notify SABINE in writing of the quantity of mmBtus of lignite to be delivered during

23 the subsequent calendar year for use at SWEPCO's Plant and an estimate of the

24 quantity requirements during each of the four (4) calendar years thereafter.   No later

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

TRUE AND CORRECT COPY

1   than August 15 of each year during the term of this Agreement, SWEPCO shall notify

2   SABINE in writing of the quantity of Norit Tons to be delivered during the subsequent

3   calendar year and the delivery schedule therefor, which delivery schedule SWEPCO,

4   upon written notice to SABINE, may increase or decrease by up to 5,000 Tons per

5   month.

6       At any time and from time to time, SWEPCO shall have the right, upon written

7   notice to SABINE, to increase or to decrease any previously issued annual nomination

8   to the extent desired by SWEPCO, subject however, to the limitations set forth in

9   **Section 1** of this **Article V**.

10      If the total mmBtus of lignite actually delivered by SABINE to SWEPCO and Norit

11  for use at SWEPCO's Plant and Norit's Plant during two (2) consecutive calendar years

12  is less than ninety (90%) of the annual quantity of mmBtus designated by SWEPCO or

13  Norit for use at SWEPCO's Plant or Norit's Plant for each of such two consecutive

14  calendar years as set forth in the annual nomination in effect at the end of each such

15  year, then the difference in the quantity delivered and ninety (90%) of the quantity

16  requested for such calendar years shall be considered an "excess deficiency". If such

17  "excess deficiency" is not caused by "Force Majeure" or is not caused by the failure of

18  SWEPCO to accept delivery of such lignite, then in addition to any other remedies

19  available to SWEPCO, it is agreed that SWEPCO shall receive a credit equal to the "per

20  Ton" Management Fee in effect for such calendar years, as adjusted, multiplied by the

21  number of Tons of such "excess deficiency", but not to exceed the total Management

22  Fee paid or due to SABINE for such calendar years, which amount shall be credited to

23  the Management Fee paid or due to SABINE for the next succeeding calendar year.

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rstmt\3rd rstmt final 12-19-08.doc

TRUE AND CORRECT COPY

1 **Section 4. Stockpiling**

2     SABINE may establish and maintain at a location(s) agreed to by SWEPCO a

3 run of mine lignite stockpile(s).  SWEPCO shall have the right to limit, at any time, the

4 size of the stockpile(s) by giving written notice to SABINE.  SABINE shall maintain such

5 stockpile(s) in accordance with good industry practices and shall take reasonable

6 precautions to prevent spontaneous combustion and water accumulation in the

7 stockpile.


8                                **ARTICLE VI**
9                                **Delivery**

10     The lignite for use at SWEPCO's Plant shall be delivered by SABINE to

11 SWEPCO at the lignite dump hopper at the boundary of the Mine adjacent to

12 SWEPCO's Plant.  The Norit Tons shall be delivered to the coal storage facility or other

13 areas in the Mine designated by SWEPCO into trucks supplied by Norit, its agents or

14 contractors.

15     For truck delivery purposes, the "boundary of the Mine" shall be the horizontal

16 plane immediately below the bottom of the truck support beams at the lignite dump

17 hopper.  SABINE shall be responsible for the maintenance of the truck support.  For belt

18 delivery purposes, the "boundary of the Mine" shall be the location along the beltline

19 that is designated by SWEPCO.


20                                **ARTICLE VII**
21                                **Quality and Recovery**

22     (a)     The lignite to be supplied to SWEPCO and/or Norit shall be from the Mine

23 in SWEPCO's Reserves and shall be of run-of-mine lignite quality.

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

FILED AND CORRECT COPY

1          SABINE shall deliver the lignite so as to be reasonably free from contamination,

2   BUT SABINE MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE

3   INHERENT QUALITY AND CHARACTERISTICS OF SWEPCO'S RESERVES.

4          Any unsatisfactory performance of such lignite caused by the inherent quality and

5   characteristics thereof shall not excuse, alter or diminish the obligation of SWEPCO to

6   make the payments provided for in **Article XII** and, so long as such lignite is mined and

7   blended as requested by SWEPCO, shall not be an event of "Force Majeure" on the

8   part of SWEPCO.

9         (b)    SABINE shall consult with SWEPCO from time to time in advance of

10   stripping overburden as to the locations in which such stripping will occur. SABINE

11   shall drill and analyze samples of lignite at such locations to project "as-delivered, as-

12   received" lignite quality and recovery in advance of stripping overburden and shall

13   provide the results of such drilling and analyses to SWEPCO. SWEPCO shall have the

14   right to review, inspect and approve in advance SABINE's drilling and testing methods

15   and analytical procedures and data provided thereby. On or before October 1 of each

16   year, SABINE shall furnish SWEPCO with a statement of the expected "as delivered-as

17   received" lignite quality, recovery parameters, and other characteristics of the lignite

18   which SABINE plans to mine during the following calendar year.

19         (c)    Upon request by SWEPCO, SABINE shall analyze the exposed lignite

20   from which the overburden has been stripped in advance of loading and shall furnish

21   such analyses to SWEPCO. SABINE shall blend the exposed lignite so as to deliver,

22   within the inherent characteristics of the exposed lignite, lignite of the characteristics

23   desired by SWEPCO.

<center>17</center>

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

TRUE AND CORRECT COPY

1   (d) The parties hereto recognize that the quality and recovery of the lignite

2 delivered to SWEPCO and/or Norit hereunder, as opposed to the quality of the lignite

3 "in-place," is directly related to good mine management practices by SABINE.  SABINE

4 shall keep SWEPCO fully informed of any significant changes in the lignite quality after

5 mining thereof and its recovery.

6             **ARTICLE VIII**
7            **Loan and Lease Obligations**

8   It will be necessary for SABINE from time to time during the term of this

9 Agreement to incur Loan and Lease Obligations.  SWEPCO recognizes that such Loan

10 and Lease Obligations will also be required for reasonable replacements at the end of

11 the useful life of certain of SABINE's equipment, for additions to certain of SABINE's

12 equipment, for meeting payment obligations incurred by SABINE in connection with

13 Loan and Lease Obligations and for maintaining working capital necessary for operating

14 the Mine in the most cost effective manner.

15   SWEPCO shall have the right to direct SABINE in incurring all such Loan and

16 Lease Obligations; provided, however, that SABINE shall not be required to incur any

17 Loan or Lease Obligation directed by SWEPCO if the terms thereof are less favorable to

18 SABINE than the terms of a Loan or Lease Obligation which, for the same term, could

19 be obtained by SABINE without such direction by SWEPCO.

20   SWEPCO shall have the right to approve or disapprove any agreement in

21 respect of any Loan or Lease Obligation which SABINE proposes to incur to carry out

22 its obligations under this Agreement.  SABINE shall submit to SWEPCO a summary of

23 the terms and conditions of any such proposed Loan or Lease Obligation.  Within thirty

18        3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
               EFFECTIVE JANUARY 1, 2009

g:\leg\#Sabine\3rd client\3rd rlmn final 12-19-08.doc

1    (30) days after receipt by SWEPCO of written notice from SABINE requesting approval

2    or disapproval of such terms and conditions, SWEPCO shall give SABINE written notice

3    of SWEPCO's approval or disapproval thereof.  If SWEPCO fails to give such notice

4    within such thirty (30) day period, SWEPCO shall be deemed to have disapproved the

5    same.   Upon disapproval by SWEPCO, SABINE shall promptly renegotiate and

6    resubmit to SWEPCO any new or alternate proposed arrangement involving a Loan or

7    Lease Obligation, and the same procedure mentioned above shall be followed.  No

8    such Loan or Lease Obligation shall be incurred or agreed to by SABINE without

9    SWEPCO's advance approval.

10       In connection with any financing pursuant to this **Article VIII**, SABINE, subject to

11    SWEPCO's prior written approval, which approval shall not be unreasonably withheld,

12    may create a security interest and/or grant a deed of trust or other appropriate lien, or

13    any right of participation in respect thereof, on any or all assets of SABINE, including

14    without limitation all or any portion of its rights hereunder, in favor of any lender or

15    lessor to SABINE and/or any guarantor of any Loan or Lease Obligation of SABINE.

16       SABINE shall have the right to pay dividends on its stock only from earned

17    surplus. For this purpose, "earned surplus" shall mean without duplication net income

18    for the most recent fiscal period and/or retained income since incorporation less

19    dividends previously paid, as determined in accordance with generally accepted

20    accounting principles and as certified to annually by SABINE's independent public

21    accountants.

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd clean\3rd clean final 12-19-08.doc

TRUE AND CORRECT COPY

<div align="center">

**ARTICLE IX**
**Compensation**

</div>

1
2

**Section 1.   Compensation During Development Period**

3

      **(a)**     **Deferred Development Costs.**

4

     During each Development Period, SABINE shall accrue all costs and expenses

5

authorized by SWEPCO and associated with the design, development, construction,

6

equipping and operation of any area of the Mine designated by SWEPCO (hereinafter

7

referred to as "Deferred Development Costs").   It is understood and agreed by the

8

parties hereto that the Deferred Development Costs with respect to any mining area of

9

the Mine shall be repaid in full by SWEPCO during the applicable Recovery Period by

10

the inclusion of such Deferred Development Costs in the Cost of Production (as

11

hereinafter defined in **Subsection 2(a)** of this **Article IX**) for such Recovery Period.

12

      **(b)**     **Compensation Under Certain Circumstances**

13

     If at any time during the term of this Agreement SABINE has not obtained

14

sufficient financing to repay all Loan and Lease Obligations theretofore incurred by

15

SABINE in connection with the development of the Mine, SWEPCO shall pay SABINE

16

amounts from time to time sufficient to permit SABINE to satisfy Loan and Lease

17

Obligations in accordance with their terms.

18

     The provisions of this **Subsection 1(b)** shall be subject to the provisions of

19

**Section 2** of **Article XII.**

20

**Section 2.   Compensation During the Production Period**

21

     During the Production Period, SWEPCO shall pay SABINE in accordance with

22

the provisions of **Article XII** for the services provided by SABINE under this Agreement

23

a sum which equals the Cost of Production plus Loan and Lease Obligations plus a

24

<div align="center">

20

</div>

g:\legal\sabine\3rd rlmnt\3rd rlmn final 12-19-06.doc

TRUE AND CORRECT COPY

1  Management Fee (as determined hereinafter under **Subsections (c)** and **(d)** of this

2  **Section 2**):

3  **(a)**  <u>Cost of Production</u>

4  For the purpose of this Agreement and except as otherwise expressly stated,

5  "Cost of Production" shall mean the costs actually incurred by SABINE in performing its

6  obligations under this Agreement, but shall exclude costs or expenses which have not

7  been authorized pursuant to this Agreement or which have been incurred over the prior

8  disapproval by SWEPCO thereof.  Such costs shall be determined and allocated on an

9  accrual basis in accordance with generally accepted accounting principles (except as

10 otherwise expressly stated herein), consistently applied, and shall include but not be

11 limited to the following:

12 (i)  All production, maintenance, delivery and accounting costs including

13      without limitation the following types of costs:

14 (aa)  Labor costs, which include wages and the costs of an incentive
15       compensation plan and all related payroll taxes, benefits and
16       fringes, including welfare plans, group insurance, vacations and
17       other comparable benefits of corporate officers and employees of
18       SABINE located at the Mine.

19 (bb)  Expense of payroll preparation, general accounting and billing
20       performed at the Mine.

21 (cc)  Consumable materials and supplies.

22 (dd)  Consumable tools.

23 (ee)  Machinery and equipment not capitalized or leased.

24 (ff)  Rental of machinery and equipment, but not including any
25       payments under leases included under **Section 2(b)** of this
26       **Article IX**.

27 (gg)  Electric power costs.

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\ts\biros\3rd rlmnt\3rd rlmm final) 12-19-08.doc

TRUE AND CORRECT COPY

1       (hh)   Reasonable and necessary services rendered by persons other
2               than Affiliates of SABINE.

3       (ii)    Insurance, including workers' compensation as required by law,
4               liability, property damage, and such other insurance as requested
5               by SWEPCO and in amounts and with insurance carriers (or self
6               insurance) approved by SWEPCO, as provided in **Article XVI.**

7       (jj)    Taxes, but not including income taxes imposed by any
8               governmental unit, except for income taxes incurred as a result of
9               reimbursement of governmental penalties and fines, and
10             reclamation costs which are not deductible under the United States
11             Internal Revenue Code.

12     (kk)   Cost of reclamation during the Production Period, including labor
13             and supplies, as required to comply with the lignite leases and all
14             applicable Federal, state, and local governmental laws, rules and
15             regulations or at such higher level of reclamation as may be
16             requested by SWEPCO.

17     (ll)    Costs incurred by SABINE relating to this Agreement in connection
18             with or as a result of the enactment, modification, interpretation,
19             repeal or enforcement of all applicable Federal, state and local
20             governmental laws, rules and regulations.

21   (mm)  Usual membership fees of the National Mining Association
22             (allocated to SABINE pro rata based on combined annual coal
23             production of SABINE and its Affiliates) and a reasonable number
24             of other professional, service and civic organization memberships
25             paid for by SABINE which are commonly maintained by mining
26             companies similarly situated in East Texas. Also, any contributions
27             and other memberships that are approved in advance by
28             SWEPCO.

29    (nn)   Deferred Development Costs, which shall be amortized ratably as
30             provided in **Section 1(a)** of this **Article IX.**

31    (oo)   Cost of reclamation and similar performance bonds as required by
32             any governmental entity obtained by SABINE in connection with the
33             performance of its obligations hereunder.

34    (pp)   Telephone and office costs, travel expenses and moving expenses
35             of exempt employees of SABINE, provided that no moving expense
36             will be allowed for any non-exempt employee of SABINE without
37             SWEPCO's prior approval.

38

22

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlmn\3rd rlmn final 12-19-08.doc

TRUE AND CORRECT COPY

1    There shall be credited to costs under this **Subsection 2(a)** any investment tax

2    credit or other tax credits based upon new investment incurred and taken by SABINE

3    and any net receipts by SABINE from rental of, or other net income derived by SABINE,

4    from real or personal property.   There also shall be credited to costs under this

5    **Subsection (a)** any gains and shall be so charged any losses on the disposal of any

6    property owned by SABINE related to the Mine or SWEPCO's Reserves, any refunds or

7    rebates related to the insurance program and any bond adjustments, any refunds or

8    rebates received by SABINE from manufacturers or vendors and any interest or

9    dividends received by SABINE on its investments, except investments of the

10   Management Fee (as determined hereinafter) and undistributed net earnings.

11   If any of the foregoing includes costs incurred by an Affiliate of SABINE and

12   charged to SABINE and except as otherwise expressly provided, they shall be included

13   only at the cost to such Affiliate without addition for any overhead, loading,

14   intercompany profit or service charge.   SABINE, in determining costs, shall give

15   SWEPCO the proportionate benefit of volume purchases participated in by SABINE and

16   Affiliates of SABINE.

17   (ii)   Real property costs, if any, but none can be incurred without advance

18          written approval by SWEPCO.

19   (iii)  General and Administrative Costs.

20          (a)   The following amount (which shall be subject to adjustment as set

21                forth herein) shall be added to the Cost of Production for general

22                and administrative costs each year during the Production Period,

23                $668,430 for calendar year 2008 and subsequent years.   SABINE

23

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlma\3rd rlma.final 12-19-08.doc

TRUE AND CORRECT COPY

1                               shall invoice SWEPCO for such amounts (as adjusted) each

2                               calendar year in equal, consecutive, monthly installments.

3         (b)       General and administrative costs which are to be covered by such

4                               amount of $668,430 (and which shall not otherwise be included in

5                               the Cost of Production), are salaries and related expenses such as

6                               payroll taxes, pensions and workers' compensation, together with

7                               travel, telephone, postage and office rent and office maintenance

8                               expense, of officers of SABINE not located at the Mine and of

9                               officers and employees of Affiliates of SABINE who perform, and

10                             for the time and to the extent they perform, functions relating to

11                             SABINE or this Agreement. Without limiting the generality of the

12                             foregoing, the expenses of executive office support, administrative

13                             support, operations management support, business development

14                             support and legal support (excluding outside litigation services and

15                             other outside legal services described below in **clause (3)** of

16                             **Section 2(a)(iii)(c))**, finance and accounting support, management

17                             information systems support, technical services support, human

18                             resources support and benefits support rendered by employees of

19                             Affiliates of SABINE shall be included in such $668,430.

20         (c)       Notwithstanding anything to the contrary contained in

21                             **Subsection 2(a)(iii)(b)**, general and administrative costs which are

22                             not to be covered by such amount of $668,430 and which otherwise

23                             shall be included in the Cost of Production are:

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

(1)  corporate franchise taxes for SABINE paid to the State of Texas, but excluding corporate franchise taxes which SABINE is required to pay to Nevada, its state of incorporation;

(2)  outside audit expense of SABINE;

(3)  litigation and other legal expenses incurred through the use of attorneys who are not employees of SABINE or Affiliates of SABINE;

(4)  actual costs of new reserve mine planning, mine permitting and special studies; and

(5)  actual costs of geologic support on drilling and modeling provided by employees of Affiliates of SABINE.

Any costs associated with work provided by employees of Affiliates of SABINE that are not included in such amount of $668,430 must be approved by SWEPCO in writing.

(d)  Effective for the calendar year 2008 and subsequent years, the amount of $668,430 for general and administrative costs for each such calendar year shall be adjusted in the same percentage by which the average of the IPD-GDP Index on the base 2000=100, published by the Bureau of Economic Analysis of the U.S. Department of Commerce, for the four calendar quarters consisting of (x) the fourth calendar quarter for the year immediately preceding the calendar year under consideration and (y) the first three calendar quarters of the year under consideration is greater or less than 103.646. If any adjustment of the amount of $668,430 for general and administrative costs made pursuant to this subsection is based upon an index figure which is subsequently revised, there shall be no further adjustment of such amount on the basis of such

25

g:\legal\sabine\3ed rlma\3rd rlma final 12-19-06.doc

TRUE AND CORRECT COPY

1    revision.  All adjustments of the amount of $668,430 for general

2    and administrative costs for a given year shall be made prior to the

3    end of March of the year following the year under consideration,

4    and any additional payment to be made by SWEPCO or refund to

5    be made by SABINE shall be made accordingly.  An example

6    calculation of such year-end adjustment to the amount of $668,430

7    for general and administrative costs is set forth in **Exhibit "D",**

8    which is attached hereto and made part hereof.

9    (e)   If at any time during the term of this Agreement it is reasonably

10   believed by either party that neither the IPD-GDP Index nor any

11   index  substituted  therefor  in  accordance  with  the  following

12   provisions  reflects  the  true  change  in  purchasing  power  of  the

13   United States dollar, then upon the written request of either party

14   SWEPCO and SABINE shall undertake good faith negotiations to

15   determine and agree upon a substituted index or method whereby

16   such change in purchasing power of the United States dollar can be

17   determined.   When and if such substituted index or method has

18   been  determined  and  mutually  agreed  upon  the  same  shall  be

19   substituted  and  put  into  effect  commencing  at  a  time  mutually

20   agreed  upon.   If  the  IPD-GDP  Index  or  any  substitute  index  is

21   changed  in  the  future  to  use  some  base  other  than  the  base  of

22   2000=100,  for  the  purposes  hereof,  the  IPD-GDP  Index  or  any

23   substitute index, as the case may be, shall be adjusted so as to be

26

g:\legal\sabine\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

1        in correct relationship to the base of 2000=100, or some other

2        alternative base which is mutually agreeable to SWEPCO and

3        SABINE.  If publication of the IPD-GDP Index or any substituted

4        index is no longer made by any Federal agency, the index to be

5        used as aforesaid shall be that index agreed to by the parties which

6        after necessary adjustment, if any, provides the most reasonable

7        substitute for said index.  If within ninety (90) days the parties

8        hereto cannot agree upon a substitute index which will accomplish

9        the purposes of this **Subsection 2(a)(iii)** the matter shall be

10        resolved by arbitration pursuant to Article XVIII hereof.

11  (iv)  Capital Related Costs. Depreciation and/or amortization to which SABINE

12        is entitled, the rates of which shall be determined by SABINE from time to

13        time.  No depreciation or amortization shall be included in the Cost of

14        Production with respect to items of property for which a lessor under a

15        lease has taken depreciation or amortization.  The rates of such

16        depreciation and/or amortization (unless SWEPCO approves otherwise),

17        for purposes of this paragraph, shall be limited to a straight-line basis over

18        the mutually agreeable anticipated useful service life of the assets.

19        SWEPCO shall be entitled from time to time to the correction of

20        anticipated useful service lives to conform to experience.  SABINE shall

21        claim all investment tax credits or similar subsequent tax benefits at the

22        times and in the amounts that will produce the greatest tax savings to

23        SABINE and resulting credits to SWEPCO.  Net gains or losses on the

27

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

1    disposition of capital assets shall be credited or charged, as the case may

2    be, to the Cost of Production.  Transactions covered by this Agreement

3    involving capital assets between SABINE and/or any one or more of the

4    Affiliates of SABINE, including contributions to the capital of SABINE, shall

5    be subject to SWEPCO's prior written approval, and such review and

6    approval of any such intercompany transfers shall be based upon needs

7    and financial justification and shall be reflected in SABINE's accounts at

8    cost to the Affiliates of the assets involved, less accrued depreciation, as

9    shown by the accounts of the transferring company.   Transactions

10   involving the disposition or transfer of capital assets shall be subject to

11   SWEPCO's prior written approval.

12   (v)    Depletion.   For any cost depletion from which SABINE obtains a tax

13   benefit, tax credit or other benefit as a result of its performance under this

14   Agreement, such benefit or credit shall be credited, at the statutory federal

15   income tax rate applicable to SABINE, to costs under this **Subsection**

16   **2(a)** and SWEPCO shall receive the benefit therefor.

17   **(b)    Loan and Lease Obligations.**

18   For purposes of this **Section 2**, Loan and Lease Obligations shall mean an

19   amount equal to all amounts payable for such period by SABINE in respect of Loan and

20   Lease Obligations but shall not include any amounts payable by SABINE in respect of

21   the repayment of the principal amount of any indebtedness of SABINE for money

22   borrowed except to the extent that SABINE does not at any time have available to it

23   sufficient funds and credit facilities to permit it to meet its obligations in respect of such

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlmn\3rd rlma-final 12-19-08.doc

TRUE AND CORRECT COPY

1  principal repayments.  Any amounts so paid by SWEPCO in respect of principal shall be

2  treated as advance payments by SWEPCO and credited by SABINE against the next

3  succeeding payment obligation of SWEPCO under **Section 2(a)** of this **Article IX**.

4    **(c)    Management Fee.**

5    Effective for the calendar year 2008 and subsequent calendar years

6  during the Production Period, SWEPCO shall pay SABINE a base management

7  fee ("Management Fee") per Ton of lignite delivered to SWEPCO during each

8  calendar year which shall be:

9    (i)    $1.0250 per Ton of lignite on all Norit Tons,

10    (ii)    $1.0250 per Ton of lignite on all Tons for use at SWEPCO's Plant

11        up to and including 2,800,000 Tons per year, and

12    (iii)    $0.8546 per Ton of lignite on all Tons for use at SWEPCO's Plant

13        over 2,800,000 Tons per year,

14  which base Management Fee shall be subject to further adjustment as hereinafter

15  provided in **Subsection 2(d)** of this **Article IX**.  SABINE shall invoice SWEPCO and

16  SWEPCO shall pay SABINE on a monthly basis for such Management Fee.

17    **(d)    Adjustment of Management Fee.**

18    **(i)** Effective for the calendar year 2008 and subsequent calendar years, the

19  Management Fee (including the maximum and minimum amounts) for each such

20  calendar year shall be adjusted in the same percentage by which the average of the

21  IPD-GDP Index on the base 2000 = 100, published by the Bureau of Economic Analysis

22  of the U.S. Department of Commerce, for the four calendar quarters consisting of (x) the

23  fourth calendar quarter for the year immediately preceding the calendar year under

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

1  consideration and (y) the first three calendar quarters of the year under consideration is

2  greater or less than 103.646.  If any adjustment of the Management Fee made pursuant

3  to this subsection is based upon an index figure which is subsequently revised, there

4  shall be no further adjustment of the Management Fee on the basis of the final

5  published figure for such index.  All adjustments of the Management Fee for a given

6  year shall be made prior to the end of March of the year following the year under

7  consideration, and any additional payment to be made by SWEPCO or refund to be

8  made by SABINE shall be made accordingly.  An example calculation of such year-end

9  adjustment to Management Fee is set forth in **Exhibit "B,"** which is attached hereto and

10  made part hereof.

11        **(ii)**    **Further Modification of Management Fee**.

12        If at any time during the term of this Agreement it is reasonably believed by either

13  party that neither the IPD-GDP Index nor any index substituted therefor in accordance

14  with the following provisions reflects the true change in purchasing power of the United

15  States dollar, then upon the written request of either party SWEPCO and SABINE shall

16  undertake good faith negotiations to determine and agree upon a substituted index or

17  method whereby such change in purchasing power of the United States dollar can be

18  determined.  When and if such substituted index or method has been determined and

19  mutually agreed upon the same shall be substituted and put into effect commencing at a

20  time mutually agreed upon.  In the event the IPD-GDP Index or any substitute index is

21  changed in the future to use some base other than the base of 2000=100, for the

22  purposes hereof, the IPD-GDP Index or any substitute index, as the case may be, shall

23  be adjusted so as to be in correct relationship to the base of 2000=100, or some other

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rbnd\3rd rbm final | 2-19-08.doc

TRUE AND CORRECT COPY

1    alternative base which is mutually agreeable to SWEPCO and SABINE.  If publication of

2    the IPD-GDP Index or any substituted index is no longer made by any Federal agency,

3    the index to be used as aforesaid shall be that index agreed to by the parties which after

4    necessary adjustment, if any, provides the most reasonable substitute for said index.  If

5    within ninety (90) days the parties hereto cannot agree upon a substitute index which

6    will accomplish the purposes of this **Subsection 2(d)(iii)** the matter shall be resolved by

7    arbitration pursuant to **Article XVIII** hereof.

8    **Section 3.  <u>Compensation for Mine Closing Operations</u>**

9          During the continuation of SABINE's operations hereunder during the Post

10   Production Period as provided for in the fourth paragraph of **Section 1** of **Article** IV,

11   SWEPCO shall compensate SABINE, which compensation shall include payment of the

12   mine closing costs provided for in **Article XI**, on the same basis as provided for in

13   **Section 2** of this **Article IX**, except that

14   (a)    in lieu of the Management Fee provided for in **Section 2(c)**, SWEPCO

15          shall pay SABINE as additional compensation a Post-Production

16          Management Fee in accordance with the schedule set forth in **Exhibit "C"**

17          which is attached hereto and made a part hereof; and

18   (b)    in lieu of the general and administrative costs provided for in

19          **Section 2(a)(iii)**, SWEPCO shall pay SABINE for general and

20          administrative costs in accordance with the Post-Production General and

21          Administrative Costs Schedule set forth in **Exhibit "F"** which is attached

22          hereto and made a part hereof.

31

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

TRUE AND CORRECT COPY

1   Such payments described in clauses (a) and (b) above shall be made on a monthly

2   basis. The Post-Production Management Fee set forth in **Exhibit "C"** shall be adjusted

3   in the same manner in which the Management Fee is adjusted pursuant to

4   **Subsection 2(d)** of **Article IX** of this Agreement, and the general and administrative

5   costs set forth in **Exhibit "F"** shall be adjusted in the same manner in which the general

6   and administrative costs are adjusted pursuant to **Section 2(a)(iii)(d)** of **Article IX** of

7   this Agreement.


8                               **ARTICLE X**
9                   **Sampling and Analysis; Weights**

10  **Section 1.  Sampling and Analysis**

11          The quality of lignite delivered to SWEPCO from the Mine for use at SWEPCO's

12  Plant shall be determined by analyses of samples taken at a point or points mutually

13  agreed upon by SWEPCO and SABINE. Sampling and analyses shall be performed by

14  methods which meet the standards of the ASTM, or by such other methods as may be

15  mutually agreed upon between SWEPCO and SABINE. SWEPCO shall cause the

16  samples to be transported to the Laboratory. Each sample shall be processed, split into

17  three (3) equal parts and placed in suitable airtight containers by SWEPCO or the

18  Laboratory. Part one of each sample shall be analyzed by the Laboratory, and the cost

19  of such analysis shall be included in the Cost of Production. Part two of each sample

20  shall be properly identified and stored in the Laboratory for a period of not less than

21  sixty (60) days for either party to analyze at its own expense if it so desires. Part three

22  of each sample shall be properly identified and stored by SWEPCO for a period of not

23  less than sixty (60) days. The cost of analysis of part three of the sample, if required,

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabind3rd rlmst\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

1    shall be borne equally by SWEPCO and SABINE.  For deliveries for which a sample is

2    not available or for which a sample is agreed by SWEPCO and SABINE to be incorrect,

3    the weighted average of the immediately preceding three (3) days sample analyses

4    which are available shall be utilized.

5         The results of the analyses performed by the Laboratory on part one of the

6    samples shall be binding on the parties and shall be deemed to represent the quality

7    and characteristics of the lignite delivered hereunder unless one party notifies the other

8    of a dispute concerning such analysis within the sixty (60) day period specified in the

9    preceding paragraph.  If the analysis of part one is disputed and the analyses of parts

10   one and two of the sample differ by more than the reproducibility values specified by

11   ASTM or any other mutually agreeable tolerances, then part three of such sample shall

12   be analyzed by a commercial testing laboratory mutually chosen and using ASTM

13   standards or mutually accepted procedures.   When all three parts of a sample are

14   analyzed, the average of the two closest sample results will be used to represent the

15   quality of the lignite delivered on the day such samples were taken; provided, however,

16   that if the two closest sample results differ by more than the reproducibility values

17   specified by ASTM or any other mutually agreeable tolerances, then the weighted

18   average of the immediately preceding three (3) days sample analyses which are

19   available shall be deemed to be the quality and characteristics of the daily delivery of

20   lignite under consideration.

21        As soon as practicable after the end of each month, SABINE shall furnish

22   SWEPCO with a summary of the analyses performed by the Laboratory during the

23   preceding month on part one of each sample.   In addition, if either party elects to

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

1    analyze part two of a sample, that party shall deliver the results of such analyses to the

2    other party within seven (7) Business Days of receiving such results.

3         SABINE and SWEPCO each shall have the right to request a bias test of the

4    sampling system if it questions the accuracy of said system.  The party requesting such

5    bias test shall pay all costs of any such challenge bias test unless the sampling system

6    is found to be in error, in which case SWEPCO and SABINE each shall pay fifty percent

7    (50%) of the costs of such test.  SABINE shall have the right to have a representative

8    present at any and all times to observe the sampling.   If the sampling system is

9    replaced or substantially modified, then SWEPCO shall perform, at its sole cost, a bias

10   test of the sampling system as so replaced, altered or modified.

11   **Section 2.  Weighing**

12        The weight of the lignite delivered to SWEPCO from the Mine for use at

13   SWEPCO's Plant shall be determined on scales properly installed on conveyor belts

14   leading from SWEPCO's lignite dumping facilities or by other means mutually agreed

15   upon by SWEPCO and SABINE.  SWEPCO shall consult with SABINE as to design,

16   selection and installation of such scale(s), and the parties shall mutually agree as to

17   such matters.  The scales shall be maintained and calibrated in accordance with the

18   manufacturer's recommended standards.  SWEPCO shall calibrate such scale(s) on a

19   regular basis during the Production Period (not less than monthly) and maintain such

20   scale(s) within design tolerance.  SABINE shall have the right to have a representative

21   present at any and all times to observe the testing and calibration of the scale(s).

22        The weight of the Norit Tons shall be determined on scales furnished and

23   maintained by Norit.

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlmnt\3rd rlmn final 12-19-08.doc

TRUE AND CORRECT COPY

1       The weights thus determined shall be accepted as the quantity of lignite

2 delivered under this Agreement and for which invoices are to be rendered and

3 payments made in accordance with **Article XII** hereof.

4       SABINE shall be given a record of all weight determinations made by SWEPCO

5 and Norit. If either SWEPCO or SABINE at any time questions the accuracy of

6 SWEPCO's scales or the Norit scales, such party may request a prompt test and

7 adjustment of such scales by utilizing a material weight test, the procedures for which

8 the parties shall mutually agree, at the requesting party's expense. If such test reveals

9 error in weight in excess of the manufacturer's specified tolerances, the scale shall be

10 adjusted to an accurate condition, and an appropriate adjustment shall be made in the

11 invoices and payments affected by such inaccuracy; provided, however, no such

12 adjustment shall be for a period in excess of the lesser of (a) one-half of the period

13 since the date that either party first questioned the accuracy of the weights and the date

14 of the last regularly scheduled test of the scales, or (b) three (3) months.

15                     **ARTICLE XI**
16              **Mine Closing Costs**

17       SWEPCO recognizes that Mine closing costs will be incurred by SABINE from

18 time to time. SWEPCO shall reimburse SABINE for all such Mine closing costs, which

19 costs shall include, but not be limited to, costs of dismantling and removal of equipment,

20 reclamation of lands disturbed by SABINE's mining operations and activities pursuant to

21 an approved Mining Plan, and actions taken by SABINE to prevent environmental

22 pollution and to comply with applicable laws, rules and regulations of Federal, state and

23 local governments and their instrumentalities. Such costs, when determined, shall be

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

TRUE AND CORRECT COPY

1    included within budgets and operating plans submitted to SWEPCO for its approval and

2    shall be paid by SWEPCO as incurred and, when conducted during the Production

3    Period, shall be deemed to be included within the Cost of Production in accordance with

4    the provisions set forth herein.  SWEPCO shall be given proper credit for all salvage

5    value.  SWEPCO from time to time may request that SABINE prepare an estimate of

6    the total of the Mine closing costs to be incurred after the Production Period, based on

7    the then current Mining Plan and a Mine closing date approved by SWEPCO.  Effective

8    January 1, 2003, Mine closing costs shall be determined in accordance with SFAS

9    No. 143, "Accounting for Asset Retirement Obligations".

10                           **ARTICLE XII**
11                           **Billing and Accounts**

12    **Section 1.**    **Payment Obligations; Billing Accounts;**
13                    **Billing Procedure**

14        Or before the twentieth (20th) day of each calendar month, SABINE shall furnish

15    SWEPCO with two written invoices which set forth the compensation due SABINE

16    under the provisions of **Article IX** or **Article XX** of this Agreement, as the case may be,

17    for the immediately preceding month, one of which shall be for the lignite delivered for

18    use at SWEPCO's Plant and the other of which shall be for the Norit Tons delivered.

19    The amount of each invoice for the lignite delivered for use at SWEPCO's Plant shall be

20    determined in accordance with **Exhibit "E"** hereto, and the amount of each invoice for

21    Norit Tons delivered shall be determined by a mutually agreed cost allocation method

22    based on the compensation due SABINE under the provisions of **Article IX** of this

23    Agreement for the immediately preceding month with respect to such Norit Tons.

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

TRUE AND CORRECT COPY

1   SWEPCO shall pay SABINE the amount of such invoices within ten (10) days of

2   SWEPCO's receipt of the same.

3        All such billings and payments shall provide for credit to SWEPCO with regard to

4   all refunds, rebates, advance payments and discounts of all types and shall be subject

5   to audit by SWEPCO and corrections and adjustments where necessary.   The

6   correction and adjustment of any undisputed deficiencies shall be adjusted on the next

7   monthly billing.

8   **Section 2.  <u>Payment Obligations Absolute</u>**

9        Except as provided in **Article XIII** (and subject to the limitation specified therein)

10   amounts payable by SWEPCO hereunder in respect of the Loan and Lease Obligations

11   shall be payable under any and all circumstances, without set-off, counterclaim,

12   recoupment, abatement, suspension, deduction or defense or other right which

13   SWEPCO may have against SABINE or any other person for any reason whatsoever

14   and shall not be refunded, it being the intention of the parties hereto that the obligations

15   of SWEPCO in respect of such payments shall be absolute and unconditional, shall be

16   separate and independent covenants and agreements and shall survive the expiration

17   or other termination of this Agreement and continue unaffected unless the requirement

18   to pay the same shall have been terminated pursuant to an express provision of this

19   Agreement, provided that the foregoing shall not operate as a waiver by SWEPCO of its

20   rights to pursue by separate action any claims it may have against any third party and

21   any claims it may have against SABINE which are covered by insurance or bonds.

22        The provisions of this **Section 2** of **Article XII** shall not be subject to the

23   arbitration provisions of this Agreement.

TRUE AND CORRECT COPY

1                                    **ARTICLE XIII**
2                                   **Reports and Audit**

3  Annually, SABINE shall have an audit of its accounts, made in whatever scope

4  and detail requested by SWEPCO, by independent public accountants acceptable to

5  SWEPCO and shall provide SWEPCO with a copy of such audit.

6  On or before the twentieth (20th) day of each month, SABINE shall furnish to

7  SWEPCO separate detailed statements of costs incurred by SABINE at the Mine for the

8  preceding month in respect of the lignite for use at SWEPCO's Plant and the Norit Tons.

9  Such statements shall be in such form and detail as requested by SWEPCO and shall

10  list the quantity and costs incurred by SABINE in respect of the lignite for use at

11  SWEPCO's Plant and the quantity and the costs incurred by SABINE in respect of the

12  Norit Tons, as the case may be.

13  SWEPCO and its duly authorized representatives shall have the right to inspect

14  all work being performed hereunder including work at the Mine. SABINE shall, at

15  SWEPCO's request, furnish to SWEPCO, or to such person as SWEPCO may

16  designate, a copy of SABINE's reports applicable to the work on which it was engaged

17  and the location of such work.

18  SABINE shall furnish with any billing containing cost adjustments, data showing

19  the computations and application of such adjustment and shall furnish promptly such

20  additional documents and evidence as SWEPCO may request in support of such

21  adjustment. SABINE agrees to maintain adequate books, payrolls and records

22  satisfactory to SWEPCO in connection with any and all work performed hereunder,

23  including but not limited to the verification of all provisions under this **Article XIII**.

24  SABINE further agrees to retain all such work records for a period of not less than four

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlmal3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

1    (4) years after completion of such work, and SABINE further agrees to consult with

2    SWEPCO prior to SABINE's disposal of such records.    SWEPCO and its duly

3    authorized representative shall have access at all reasonable times to the books,

4    payrolls, records, correspondence and personnel of SABINE and any Affiliate of

5    SABINE relating to any of the work performed hereunder for the purpose of auditing and

6    verifying SABINE's charges for work or for any other reasonable purpose including, but

7    not limited to, compliance by SABINE with other terms and provisions of this

8    Agreement.    SABINE agrees that (if and when applicable) these provisions will be

9    included in any consulting services or other subcontracts relating to work performed for

10    SABINE under provisions of this Agreement.

11        SWEPCO shall have access and the right to examine all income tax filings of

12    SABINE or in which SABINE is included.  SABINE shall have the right to join with any

13    Affiliates of SABINE in the filing of any consolidated tax return, but this right shall be

14    applicable only if the exercise thereof will not increase the cost of lignite to SWEPCO.  If

15    SABINE so joins in such filing, SABINE shall promptly furnish SWEPCO a copy of North

16    American Coal's consolidated tax sharing agreement and shall promptly furnish to

17    SWEPCO a revised copy at any time such agreement is amended.  Savings applicable

18    to SABINE as a result of any such consolidation shall be invested by SABINE and will

19    serve to further reduce the cost of lignite to SWEPCO.  If SABINE files consolidated tax

20    returns with an Affiliate or Affiliates of SABINE, it shall collect from such Affiliate or

21    Affiliates any net tax benefit derived by any such Affiliate from such consolidation

22    attributable to SABINE.  Any net tax benefit collected by SABINE arising from any such

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

1  consolidation which was directly attributable to SABINE shall be repaid promptly to any

2  such Affiliate(s) in the event such net tax benefit is reversed for whatever reason.

3      Any correction and adjustment of undisputed audit deficiencies determined by

4  audit shall be made within thirty (30) days after determination thereof.  Any disputed

5  audit deficiency shall be finally determined and resolved by a nationally recognized

6  independent accounting firm selected by mutual agreement of SWEPCO and SABINE,

7  and its decision and determination shall be binding on the parties, and the correction

8  and adjustment shall be made within thirty (30) days after such determination.  The cost

9  and expense of such third-party audit of a disputed deficiency shall be borne by the

10  losing party, meaning the party whose position is furthest from the final determination,

11  and if SABINE is the losing party such cost and expense of audit shall not be

12  recoupable from SWEPCO.

13      Anything to the contrary in the foregoing provisions of this **Article XIII**

14  notwithstanding, SWEPCO hereby agrees that without the advance written approval of

15  the obligees of all Loan and Lease Obligations then outstanding it will not collect from

16  SABINE, in connection with any claim against SABINE hereunder, any amount in

17  excess of SABINE's net income and retained earnings (determined without duplication),

18  plus all amounts available to or from SABINE under bonding, insurance, and similar

19  arrangements.

20                          ARTICLE XIV
21                          Force Majeure

22      In the event SWEPCO or SABINE is rendered unable, wholly or in part, by "Force

23  Majeure" as hereinafter defined to carry out any of its obligations under this Agreement,

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2006

TRUE AND CORRECT COPY

1    and if such party shall (within two [2] Business Days after the declaring party is aware of

2    the occurrence of such "Force Majeure" relied upon) give the other party concerned

3    written notice and full particulars of such "Force Majeure", then the obligations of the

4    party giving such notice shall be suspended to the extent made necessary by such

5    "Force Majeure" from the inception of the "Force Majeure" and during its continuance,

6    but for no longer; provided, however, that the party giving such notice shall diligently

7    use its best efforts to eliminate the cause and effect of such "Force Majeure" insofar as

8    possible with all reasonable dispatch.  Any deficiencies in the production or delivery of

9    lignite hereunder caused by "Force Majeure" shall not be made up under the provisions

10   of this Agreement except by mutual agreement.

11           The term "Force Majeure" as used in this Agreement shall mean any and all

12   causes beyond the control and without the fault or negligence of the party failing to

13   perform, such as acts of God, strikes, lockouts or other industrial disturbances, labor

14   disputes, labor or material shortages, acts of the public enemy, wars, blockades,

15   insurrections, riots, epidemics, landslides, adverse geological conditions, faults in lignite

16   seams, lightning, earthquakes, fires, storms, floods, washouts, major breakdowns of or

17   damage to plant, SWEPCO's Plant, mine equipment, or facilities, interruptions to or

18   contingencies of transportation, orders or acts of a military authority or civil authority

19   (including without limitation, interruptions, whether by action or inaction, by Federal,

20   state or local governments or court orders, present and future, or acts or failures to act

21   of any regulatory body having proper jurisdiction) and any other causes, whether of the

22   kind herein enumerated or otherwise, beyond the control and without the fault or

23   negligence of the party failing to perform, which wholly or partly prevents the mining,

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

TRUE AND CORRECT COPY

1  producing, processing and delivering of the lignite by SABINE, or the receiving and/or

2  utilizing of the lignite by SWEPCO.  It is understood and agreed that the settlement of

3  strikes or lockouts or industrial disputes or disturbances shall be entirely within the

4  discretion of the party having the difficulty and that the above requirement that any

5  "Force Majeure" shall be remedied with all reasonable dispatch shall not require the

6  settlement of strikes or lockouts by acceding to the demands of the opposing party

7  therein when such course is inadvisable in the discretion of the party having the

8  difficulty.

9  It is agreed that no such event of "Force Majeure" shall excuse, alter or diminish

10  the obligation of SWEPCO to make the payments provided for in **Article XII** hereof.

11  During any period of "Force Majeure", SABINE agrees to make a diligent effort to

12  minimize all costs and expenses incurred.

13

14  **ARTICLE XV**
15  **Conduct of Operations**

16  SABINE shall conduct its mining operations hereunder in a careful, good

17  workmanlike manner.  SABINE shall use its best efforts to design and operate the Mine

18  in accordance with this Agreement and all applicable laws, rules and regulations of

19  Federal, state and local governments or their instrumentalities; provided, however, that

20  SABINE shall have the right to contest in good faith through appropriate legal

21  proceedings the validity or applicability of any such law, rule or regulation so long as

22  SABINE gives SWEPCO advance notice of the nature of and reasons for such

23  proposed contest and of such proposed proceedings and obtains SWEPCO's advance

24  approval of the projected cost and expenses thereof, which approval shall not be

42  3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

1    unreasonably withheld; and further provided, however, SABINE shall not be in default in

2    the performance of its obligations under this Agreement if and to the extent such failure

3    to perform its obligations is due to (1) an event described in **Article XIV** hereof, (2)

4    control exercised by SWEPCO pursuant to **Section 2(c)** of **Article IV** or **Article VIII** of

5    this Agreement, or (3) the failure of SWEPCO to perform its obligations hereunder.

6           SABINE represents that its management and supervisory personnel and a major

7    portion of its other employees shall be well qualified and trained personnel with

8    established credentials in engineering, constructing, operating and administering similar

9    projects and that it will utilize and exercise high standards of industry practice and

10   workmanship in the performance of all of its undertakings and obligations reflected in

11   this Agreement.   SABINE agrees to the foregoing and agrees that it shall diligently

12   attempt and use its best efforts to:

13           (a)    mine, recover and deliver the optimum quantity and quality of
14           mineable commercial lignite, as defined in the approved Annual Mining Plan, in
15           the most economical and efficient manner;

16           (b)    conduct its operations and carefully plan and supervise its capital,
17           operating and all other expenditures and acquisitions pursuant to the advance
18           approval by SWEPCO as provided herein so as not to exceed the pre-approved
19           budgets, as provided herein.

20                              **ARTICLE XVI**
21                              <u>Insurance</u>

22           SABINE shall procure or cause to be procured and maintain or cause to be

23   maintained in full force and effect all insurance coverages specified in this Agreement.

24   All insurance coverages shall be in accordance with the terms of this Article XVI using

25   companies authorized to do business in the applicable jurisdiction where such services

26   are to be performed.   The insurance shall be of such types, limits, coverages and

43                      3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
                        EFFECTIVE JANUARY 1, 2008

TRUE AND CORRECT COPY

1    amounts, and deductible amounts and with such insurers as may periodically be

2    required, requested or approved by SWEPCO applicable to the Mine, the equipment

3    and property at the Mine, the operation of the Mine or operations incidental to the Mine

4    and personnel at the Mine or utilized in connection therewith.   Such insurance shall

5    include, but shall not be limited to, public liability, contractual liability, all-risk property

6    insurance including coverage for physical damage to equipment, mine reclamation

7    bonds and workers' compensation insurance as required by law and the following:

8         (a)     Coverage for the legal liability of SABINE and its subcontractors for

9    workers' compensation and occupational disease under the law of the state in which the

10   work hereunder is to be performed; provided, however,

11             A. in states with a workers' compensation fund, SABINE and its

12                subcontractors shall be contributors to the state workers'

13                compensation fund and shall furnish a certificate to that effect.

14             B. in states without a workers' compensation fund, SABINE and its

15                subcontractors shall maintain an insurance policy for workers'

16                compensation from an insurance carrier approved for transacting

17                workers' compensation business in the state in which the work is

18                performed.

19             C. if SABINE or any subcontractor is a legally permitted and qualified self-

20                insurer in the state in which the work is performed, it may furnish proof

21                that it is such a self-insurer in lieu of submitting proof of insurance.

22        (b)     commercial general liability insurance with limits of coverage of not less

23   than $1,000,000 per occurrence and annual aggregate;

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd\rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

1    (c)  commercial automobile liability insurance with limits of coverage for bodily

2 injury and property damage of not less than $1,000,000 for each incident;

3    (d)  excess or umbrella liability insurance with a combined single limit of

4 coverage of not less than $5,000,000 per occurrence and annual aggregates of at least

5 $10 million for bodily injury and property damage, and including coverage for the excess

6 of Employers Liability and the insurance described in paragraphs (b) and (c) above;

7    (e)  Property Damage and Boiler and Machinery coverage with combined

8 limits of coverage of not less than $100 Million per occurrence and a deductible of no

9 more than $1,000,000; and

10    (f)  pollution legal liability insurance with limits of coverage of not less than

11 $1,000,000 per occurrence and annual aggregate.

12    SWEPCO, its parent, subsidiaries, Affiliates, directors, officers, agents, and

13 employees, shall be named as additional insureds under the insurance policies

14 described in paragraphs (b) through (d) and paragraph (f) above, and as loss payees

15 under the insurance policies described in paragraph (e) above, with respect to

16 SABINE's operations and the work to be performed under this Agreement.   Such

17 insurance shall be primary and non-contributory over any other insurance maintained by

18 SWEPCO, its parent, subsidiaries and Affiliates.

19    SABINE shall obtain waivers of subrogation on all insurance maintained by

20 SABINE hereunder.  Such waivers shall be made for the benefit of SWEPCO, its parent,

21 subsidiaries and Affiliates.

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

1    Any policies of insurance written on a "claims-made" basis shall be maintained

2    for a period of five (5) years after termination of this Agreement, provided that such

3    coverage is available and that SWEPCO pays all costs of maintaining such insurance.

4    SABINE shall furnish annually to SWEPCO two (2) copies of acceptable

5    certificates of insurance covering the terms of the insurance policies maintained by

6    SABINE.  Such certificates of insurance shall state that the insurer has issued the

7    policies providing for the insurance specified above, that such policies are in force and

8    that the insurer shall give SWEPCO thirty (30) days prior written notice of any material

9    change in, or cancellation of, such policies.  If such insurance policies are subject to any

10   exceptions to the terms specified herein, such exceptions shall be fully explained in

11   such certificates.  SWEPCO may, at its discretion, require SABINE to obtain insurance

12   policies that are not subject to any exceptions.

13   SABINE shall require all contractors, subcontractors and its Affiliates engaged in

14   work on or for the Mine to comply with the applicable workers' compensation laws of the

15   State of Texas, or any other applicable state to the end that the employer is protected

16   against any common law action by an employee and to maintain such other insurance

17   as SWEPCO may deem advisable.

18

19                                  **ARTICLE XVII**
20                          <u>**Relationship of the Parties**</u>

21   SWEPCO and SABINE agree that in performing services hereunder SABINE

22   shall be an independent contractor and not the agent, servant or employee of SWEPCO

23   or any of its affiliate companies or of Norit.  Nothing contained in this Agreement shall

24   be construed to constitute or create a joint venture, trust, mining partnership,

46                        3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
                              EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlstmt\3rd rlstm final 12-19-08.doc

TRUE AND CORRECT COPY

1  commercial partnership or other relationship between SWEPCO or any of its affiliate

2  companies or Norit and SABINE whereby either party hereto would be liable for the acts

3  and deeds of the other party hereto, except as specifically set forth herein.

4  SABINE SHALL INDEMNIFY, HOLD HARMLESS AND DEFEND SWEPCO

5  AND ITS SUBSIDIARIES, AFFILIATES AND THEIR DIRECTORS, OFFICERS,

6  EMPLOYEES AND AGENTS, THE SUCCESSORS AND ASSIGNS OF SWEPCO

7  (COLLECTIVELY, "RELEASEES"), FROM ANY AND ALL LOSS AND LIABILITY

8  AND FOR CLAIMS, DEMANDS, SUITS OR CAUSES OF ACTION AT LAW OR IN

9  EQUITY FOR DAMAGES AND INJURIES (INCLUDING DEATH) OF EVERY KIND

10  AND NATURE TO PERSONS (INCLUDING EMPLOYEES OF SABINE, SWEPCO

11  AND ANY OF THEIR AFFILIATES) AND PROPERTY (INCLUDING LOSS OF USE

12  THEREOF) ARISING OUT OF, OR CLAIMED TO HAVE BEEN CAUSED BY, OR IN

13  ANY MANNER RELATED TO THE OPERATIONS OF SABINE OR OF ANY PERSON

14  UNDER CONTRACT TO IT UNDER THIS AGREEMENT EVEN THOUGH CAUSED IN

15  WHOLE OR IN PART BY THE NEGLIGENCE OF ANY SINGLE RELEASEE OR ANY

16  COMBINATION OF RELEASEES THAT OPERATES CONCURRENTLY WITH THE

17  NEGLIGENCE OF ANY PERSON OR ENTITY THAT IS NOT A RELEASEE, BUT IN

18  NO EVENT FOR THE SOLE NEGLIGENCE OF ANY RELEASEE OR ANY

19  COMBINATION OF RELEASEES;  PROVIDED,  HOWEVER,  THAT,

20  NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN,

21  SABINE'S INDEMNITY OBLIGATION UNDER THIS PARAGRAPH SHALL BE

22  LIMITED TO $500,000 AND SHALL BE SUPPORTED BY LIABILITY INSURANCE

23  COVERAGE TO BE FURNISHED BY SABINE, AND PROVIDED, FURTHER,

47

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

TRUE AND CORRECT COPY

1   HOWEVER, THAT SABINE SHALL NOT BE OBLIGATED TO INDEMNIFY ANY

2   RELEASEE (I) AGAINST ANY LOSS OR LIABILITY WITH RESPECT TO WHICH

3   SABINE IS NOT COVERED BY SUCH INSURANCE, (II) FOR THE AMOUNT OF ANY

4   LOSS OR LIABILITY IN EXCESS OF THE AMOUNT WHICH IS COVERED BY SUCH

5   INSURANCE OR (III) FOR ANY LOSS OR LIABILITY WITH RESPECT TO ANY

6   EMPLOYEE OF NORIT OR ANY OF ITS AGENTS OR CONTRACTORS.

7       Notwithstanding anything to the contrary contained in this Agreement, in the

8   event of a disagreement, controversy or litigation between SABINE and SWEPCO

9   involving this Agreement, any provision hereof or the subject matter hereof, the legal

10  costs and expenses of SABINE in connection therewith shall not be recouped by

11  SABINE or considered a Cost of Production or a reimbursable expense under the terms

12  hereof, unless SABINE is the ultimate successful party in such disagreement,

13  controversy or litigation.


14                          **ARTICLE XVIII**
15                          **Arbitration**

16      Any valid dispute between the parties arising out of this Agreement (including

17  failure to agree on matters slated to be determined by mutual agreement) for which the

18  ultimate resolution is not expressly provided by this Agreement or for which arbitration is

19  not expressly excluded, shall be resolved by arbitration.  The parties shall first make a

20  diligent good faith attempt to resolve the dispute by mutual agreement.  If unsuccessful,

21  the request for arbitration shall be in writing setting forth in detail the claim or claims to

22  be arbitrated, and the amount involved, if any, and shall specify the position of the party

23  giving the notice, the reasons therefore and the remedy sought and shall name one

g:\legal\cabinet\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

1    qualified person to act as an arbitrator. It shall be delivered to the other party within 180

2    days of the date of the first knowledge of the claiming party of the occurrence or

3    conditions giving rise to the dispute. Any failure to request arbitration within such 180

4    day period shall be deemed a waiver of the right to arbitrate the dispute.

5        Within fifteen (15) days after such notice is received, the party receiving the

6    notice shall by written notice to the other party specify its position, the reasons therefor

7    and the remedy sought with respect to such issue and shall name one qualified person

8    to act as an arbitrator. All persons appointed to act as arbitrator (including the third

9    arbitrator selected as provided below) shall be disinterested persons qualified by

10   experience to hear and determine the questions to be arbitrated, and if the nature of any

11   such question shall so require, they shall be geologists or mining engineers experienced

12   in the exploration for or mining of minerals under operating conditions similar to those

13   which may be encountered hereunder.

14       The two arbitrators so designated shall select a third arbitrator. If the two

15   arbitrators cannot agree within fifteen (15) days as to the designation of a third

16   arbitrator, then said third arbitrator shall be selected pursuant to the AAA Rules. The

17   arbitrators and SWEPCO and SABINE shall hold hearings in Dallas, Texas on the

18   matters to be arbitrated within thirty (30) days after the appointment of the third

19   arbitrator. The arbitrators shall make such examinations and investigations as they may

20   deem necessary and shall render their decision in writing within sixty (60) days following

21   such hearings.

22       The decision of the arbitrators shall be limited to selecting either the position and

23   remedy stated by SWEPCO in its notice or the position and remedy stated by SABINE

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2006

g:\legal\sabine\3rd stmnt\3rd stmnt final\ 12-19-05.doc

TRUE AND CORRECT COPY

1  in its notice as provided above.  The arbitrators shall have no power to mediate or

2  compromise any dispute but shall have only the limited authority herein provided to

3  review the information presented by the parties and to select the position and remedy

4  proposed by one of the parties.

5      The decision of the arbitrators shall be final and binding on the parties, and

6  judgment thereon may be entered in any court of competent jurisdiction.  The cost and

7  expense for the arbitration shall be shared equally between the parties.  Except as

8  herein otherwise specified, the arbitration shall be conducted pursuant to the AAA Rules

9  in effect at the time of such arbitration.  Unless the parties mutually agree otherwise,

10  each arbitration procedure and hearing shall be limited in scope to one dispute.

11      Notwithstanding anything to the contrary contained in this **Article XVIII**, it is

12  agreed that whenever it is provided in this Agreement that any act, event, decision,

13  determination or other matter is or is not to be done, performed or made at the option,

14  election, request or determination or in the opinion of SWEPCO or is subject to the right

15  of approval or disapproval by SWEPCO, such determination, election, request, option,

16  opinion, approval or disapproval by SWEPCO shall not be subject to arbitration

17  hereunder.

18      It is mutually understood that the existence of a dispute which has or may

19  become the subject of an arbitration shall in no way excuse either SWEPCO or SABINE

20  from performing its obligations under this Agreement, and each of the parties hereto

21  shall continue to perform in accordance with the terms of this Agreement irrespective of

22  the existence of any such dispute.

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\lee\mjm3\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

<center>**ARTICLE XIX**
**SABINE Default; Remedy**</center>

**Section 1. <u>SABINE Default</u>**

For the purposes of this Agreement, any one of the following events is a "SABINE Default":

(a)    there exists at any time during the Production Period for any reason other than Force Majeure, as defined in **Article XIV**, a deficiency of deliveries of mmBtus of lignite in excess of twenty-five percent (25%) of the amount required to be delivered under **Article V** for use at SWEPCO's Plant during the immediately preceding six-month period or a deficiency of deliveries of mmBtus of lignite in excess of twenty percent (20%) of the amount required to be delivered under **Article V** for use at SWEPCO's Plant during the immediately preceding twelve-month period;

(b)    SABINE fails to perform any of its obligations in accordance with the performance standards recited in **Article XV** hereof, which failure to perform has a material adverse effect on the operations of SWEPCO's Plant, and such failure continues unremedied for sixty (60) days after written notice thereof shall have been given to SABINE by SWEPCO;

(c)    SABINE materially breaches any of the terms, conditions or provisions which results in an event of default in respect of any Loan or Lease Obligation, which default is not remedied by SABINE prior to the time that any party (other than SABINE) to such Loan or Lease Obligation is permitted by such Loan or Lease Obligation to exercise its rights with respect to such event of default thereunder;

(d)    SABINE or North American Coal commences a voluntary case under any chapter of the Federal Bankruptcy Code or consents to (or fails to controvert in a timely

<center>51</center>

TRUE AND CORRECT COPY

1    manner) the commencement of an involuntary case against SABINE or North American

2    Coal under said Code;

3         (e)    SABINE or North American Coal institutes proceedings for liquidation,

4    rehabilitation, readjustment or composition (or for any related or similar purpose) under

5    any law other than the Federal Bankruptcy Code or consents to (or fails to controvert in

6    a timely manner) the institution of any such proceedings against SABINE or North

7    American Coal;

8         (f)    SABINE or North American Coal is insolvent (within the meaning of any

9    applicable law), or is unable, or admits in writing its inability, to pay its debts generally

10    as they come due or makes an assignment for the benefit of creditors or enters into any

11    arrangement for the adjustment or composition of debts or claims;

12         (g)    a court or other governmental authority or agency having jurisdiction in the

13    premises enters a decree or order (i) for the appointment of a receiver, liquidator,

14    assignee, trustee or sequestrator (or other similar official) of SABINE or North American

15    Coal or of any part of the property of such person or for the winding-up or liquidation of

16    the affairs of such person, and such decree or order remains in force undischarged and

17    unstayed for a period of more than thirty (30) days, or (ii) for the sequestration or

18    attachment of any property of SABINE or North American Coal without its unconditional

19    return to the possession of such person, or its unconditional release from such

20    sequestration or attachment, within thirty (30) days thereafter;

21         (h)    a court having jurisdiction in the premises enters an order for relief in an

22    involuntary case commenced against SABINE or North American Coal under the

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

1 Federal Bankruptcy Code, and such order remains in force undischarged and unstayed

2 for a period of more than thirty (30) days;

3       (i)      a court or other governmental authority or agency having jurisdiction in the

4 premises enters a decree or order approving or acknowledging as properly filed or

5 commenced against SABINE or North American Coal a petition or proceedings for

6 liquidation, rehabilitation, readjustment or composition (or for any related or similar

7 purpose) under any law other than the Federal Bankruptcy Code, and any such decree

8 or order remains in force undischarged and unstayed for a period of more than thirty

9 (30) days; or

10       (j)      SABINE or North American Coal takes corporate action for the purpose or

11 with the effect of authorizing, acknowledging or confirming the taking or existence of any

12 action or condition specified in paragraphs (d), (e) or (f) of this **Section 1**.

13        Provided, however, if SWEPCO claims that a SABINE Default of the nature

14 described in this **Section 1** has occurred and is continuing, SABINE shall have sixty

15 (60) days (notwithstanding the provisions of **Article XVIII** hereof) after its receipt of

16 written notice from SWEPCO of such SABINE Default to:

17       (i)      except for a SABINE Default of the nature described in
18 **Subsection 1(a)** of this **Article XIX**, which such default is not subject to this
19 paragraph (i), correct such SABINE Default, or, if such SABINE Default is not
20 correctable within said sixty (60) day period, to submit to SWEPCO for its
21 approval, which approval shall not be unreasonably withheld, a plan and
22 timetable for correcting such SABINE Default. If such Default is not corrected
23 within said time, or any extended time approved by SWEPCO, SWEPCO's
24 remedies provided for herein shall thereupon be fully available; or

25       (ii)      give SWEPCO written notice that SABINE disputes that such
26 SABINE Default has occurred and is continuing and that SABINE is submitting
27 the matter to arbitration in accordance with the provisions of **Article XVIII** of this
28 Agreement. If arbitration is so sought, SABINE shall not be deemed in default

53

g:\lega\sabine\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

until the matter has been determined finally by arbitration under the provisions of **Article XVIII** hereof.

**Section 2.**  **Remedy of SWEPCO Upon SABINE Default**

Upon the occurrence of any SABINE Default, SWEPCO, in its discretion (and in addition to any other rights or remedies available to SWEPCO), may exercise (without any other prerequisites) its rights, options and powers under the Option Agreement, in which event no further Management Fee will be payable to SABINE or North American Coal. Any amounts paid by SWEPCO other than to SABINE in respect of any Loan or Lease Obligation shall be credited against its obligations hereunder to make payments in respect of such Loan or Lease Obligation. The exercise by SWEPCO of any remedy hereunder shall be governed by the last sentence of **Article XIII**.

**Section 3.**  **Limitations on SWEPCO's Rights Under Article XIX**

Notwithstanding anything to the contrary contained in this **Article XIX,** SWEPCO shall not have the right to exercise the Option Agreement if a SABINE Default of the nature described in **Section 1** of this **Article XIX** has occurred and is continuing:

(a)     as a result of any failure by SWEPCO to carry-out its obligations under this Agreement, or as a result of a failure by SWEPCO to approve any Loan or Lease Obligation which SABINE proposes to enter into pursuant to **Article VIII**;

(b)     as a result of any failure by SWEPCO to pay to SABINE any sum due SABINE from SWEPCO pursuant to this Agreement; provided, however, that if SWEPCO's obligation to pay any such sum (or any part thereof) is disputed by SWEPCO and payment of such sum is necessary to enable SABINE to comply with the terms of any Loan or Lease Obligation entered into pursuant to **Article VIII** hereof or to enable SABINE to prevent the occurrence of a SABINE Default of the nature described

54

g:\legal\sabine\3rd ritmt\3rd rtlma final 12-19-08.doc

TRUE AND CORRECT COPY

1    in **Section 1** of this **Article XIX**, then SWEPCO shall pay SABINE the full sum claimed

2    by SABINE, and such payment shall be without prejudice to SWEPCO's position in such

3    dispute and its right to obtain reimbursement thereof;

4        (c)    as a result of SABINE's compliance with any directions and/or prohibitions

5    of SWEPCO to SABINE contrary to SABINE's recommendations and advice as to the

6    design, construction, development and operation of the Mine; or

7        (d)    because of a reasonable difference with governmental authorities as to

8    the interpretation of applicable governmental laws, rules or regulations, impossibility of

9    compliance therewith, or SWEPCO's consent to non-compliance therewith.

10
11
<div align="center">

**ARTICLE XX**
**Termination of Relationship**
</div>

12    **Section 1. Events of Termination**

13        This Agreement shall terminate and SWEPCO and SABINE shall be released,

14    except as provided in this **Article XX**, Section 1, from their respective obligations

15    thereafter accruing hereunder upon the occurrence of either of the following events:

16        (a)    if SWEPCO takes the action specified in **Section 2** of **Article XIX** hereof,

17    in which event SWEPCO shall be and become obligated to make payments to SABINE

18    from time to time sufficient to permit SABINE to satisfy Loan and Lease Obligations in

19    accordance with their terms; or

20        (b)    if at any time all economically surface mineable lignite reserves in

21    SWEPCO's Reserves have been depleted or SWEPCO's Plant has reached the end of

22    its useful life (estimated to be 2035), in which event SWEPCO shall be and become

<div align="center">55</div>

g:\legal\sabine\3rd rlmn\3rd rlmn flmn\ 12-19-08.doc

TRUE AND CORRECT COPY

1    obligated to make payments to SABINE from time to time sufficient to permit SABINE to

2    satisfy Loan and Lease Obligations in accordance with their terms.

3    **Section 2.  <u>Additional Right of Termination</u>**

4              In addition to the events of termination specified in **Section 1** of this **Article XX**

5    and notwithstanding any other provision of this Agreement, SWEPCO and SABINE

6    each shall have the right, in their respective unqualified and unrestricted discretion and

7    without requirement of cause, to terminate the relationship created by this Agreement

8    by giving notice of termination (which notice shall specify the effective date of such

9    termination ("Termination Effective Date"), which shall not be earlier than one year from

10   the date of such notice), in which event SWEPCO shall (i) be and become obligated to

11   make payments to SABINE from time to time sufficient to permit SABINE to satisfy Loan

12   and Lease Obligations in accordance with their terms as the same become due and

13   payable, and (ii) exercise its rights, options and powers under the Option Agreement. If

14   SWEPCO terminates this Agreement pursuant to this **Section 2** and the reason therefor

15   is not because of a SABINE Default, or is not due to a shutdown of the Mine because of

16   economic reasons, including, but not limited to, the purchase of fuel from a more cost

17   effective source, governmental requirements or restrictions or otherwise, and SWEPCO

18   mines, or causes to be mined, within two (2) years after the Termination Effective Date

19   lignite from said SWEPCO's Reserves, then North American Coal shall be entitled to,

20   and SWEPCO shall cause the successor mining company to pay, and SWEPCO shall

21   guarantee the payment, to North American Coal or its nominee   an   amount (the

22   "Termination Fee") calculated in accordance with the methodology  set forth in **Exhibit**

23   **"G,"** which is attached hereto and made part hereof.

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

1        Such Termination Fee, if payable under this **Article XX, Section 2**, (a) shall be

2    due within sixty (60) days following the recommencement of mining in the event that

3    SWEPCO commences or causes another person to commence the mining of lignite

4    from SWEPCO's Reserves within said two (2) years, and (b) shall be determined as of

5    the first day of the calendar quarter in which the recommencement of mining occurs,

6    based on the Termination Fee for the year in which the Termination Effective Date

7    occurs and on the percentage change in the value of the IPD-GDP Index on the base

8    2000 = 100 from the fourth calendar quarter of 2008 to the value of such Index for the

9    calendar quarter immediately preceding the calendar quarter in which the

10    recommencement of mining occurs.  If the value of the IPD-GDP Index on the base

11    2000 = 100 for such immediately preceding calendar quarter is not available when the

12    Termination Fee is due and payable, the most current quarterly value of such Index

13    shall be used for making payment of the Termination Fee, and such payment shall be

14    subject to true-up at the time the final published value of the IPD-GDP Index on the

15    base 2000 = 100 for such immediately preceding calendar quarter is available.

16        If at any time during the term of this Agreement it is reasonably believed by either

17    party that neither the IPD-GDP Index nor any index substituted therefor in accordance

18    with the following provisions reflects the true change in purchasing power of the United

19    States dollar, then upon the written request of either party SWEPCO and SABINE shall

20    undertake good faith negotiations to determine and agree upon a substituted index or

21    method whereby such change in purchasing power of the United States dollar can be

22    determined.  When and if such substituted index or method has been determined and

23    mutually agreed upon, the same shall be substituted and put into effect commencing at

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

TRUE AND CORRECT COPY

1    a time mutually agreed upon.  In the event the IPD-GDP Index or any substitute index is

2    changed in the future to use some base other than the base of 2000=100, for the

3    purposes hereof, the IPD-GDP Index or any substitute index, as the case may be, shall

4    be adjusted so as to be in correct relationship to the base of 2000=100, or some other

5    alternative base which is mutually agreeable to SWEPCO and SABINE.  If publication of

6    the IPD-GDP Index or any substituted index is no longer made by any Federal agency,

7    the index to be used as aforesaid shall be that index agreed to by the parties which after

8    necessary adjustment, if any, provides the most reasonable substitute for said index.  If

9    within ninety (90) days the parties hereto cannot agree upon a substitute index which

10    will accomplish the purposes of this **Article XX, Section 2,** the matter shall be resolved

11    by arbitration pursuant to **Article XVIII** hereof.

12    **Section 3.  <u>Procedures on Termination</u>**

13    Upon the termination of this Agreement as provided in **Section 1** or **2** of this

14    **Article XX**, the provisions of **Article XII** shall govern the procedures for such payments

15    by SWEPCO and the nature of SWEPCO's obligations in respect thereof.

16    **Section 4.  <u>Nature of Termination Rights</u>**

17    The rights of termination set forth in this **Article XX** shall not be subject to

18    arbitration, and neither party shall have any right in law or equity against the other solely

19    because of any such termination.

TRUE AND CORRECT COPY

|    | **ARTICLE XXI** |
|----|----|
| 1  |  |
| 2  | **Notices and Other Communications;** |
| 3  | **Designated Representatives** |

4    SWEPCO and SABINE each shall appoint a representative ("Designated

5    Representative") to receive and give on behalf of SWEPCO and SABINE all notices,

6    approvals, disapprovals and other communications required or permitted under this

7    Agreement.

8        Except as otherwise expressly stated in this Agreement, any such notice or

9    approval, disapproval or other communication shall be in writing to the other party and

10   shall be deemed to have been duly given when delivered in person or by facsimile

11   transmission (as evidenced by confirmation of facsimile transmission) to the Designated

12   Representative or when actually received (as evidenced by return receipt after posting

13   by United States certified mail, return receipt requested), with postage prepaid,

14   addressed to the Designated Representatives of SWEPCO and SABINE, as follows:

15           (a)    to SWEPCO:

16

17                  Southwestern Electric Power Company
18                  Attn: Manager, Lignite & Business Services
19                  2396 Farm Road 3251
20                  Hallsville, Texas 75650-7723
21                  Telephone:   903/938-0321
22                  Facsimile:   903/927-5820
23

24                  With copy to:

25

26                  American Electric Power
27                  Attn: Director of Mining Operations
28                  155 W. Nationwide Blvd.
29                  Columbus, OH 43215
30                  Telephone:   (614) 583-6400
31                  Facsimile:   (614) 583-1602
32

33

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\lega\Sabine\3rd class\3rd clean final 12-19-08.doc

TRUE AND CORRECT COPY

<table>
<tr><td>1</td><td>(b)</td><td>to SABINE:</td></tr>
</table>

        (b)    to SABINE:

The Sabine Mining Company
Attn: President
6501 Farm Road 968 West
Hallsville, Texas 75650
Telephone: 903/660-4200
Facsimile: 903/660-3665

With copy to:

The North American Coal Corporation
Attn: President and Chief Executive Officer
14785 Preston Road, Suite 1100
Dallas, Texas 75254-7891
Telephone: (972) 239-2625
Facsimile: (972) 387-1031

        (c)    To such other address or addresses as the respective parties hereto may from time to time designate in writing.

It is agreed that wherever this Agreement provides for notice to be given within twenty-four (24) hours of certain occurrences, such notice shall be given verbally and shall subsequently be confirmed in writing in the manner provided for above in this **Article XXI**.

<div align="center">

**ARTICLE XXII**
**Right of Inspection**

</div>

SWEPCO (upon first giving reasonable notice to the office of SABINE's Designated Representative) at all times and for any purpose shall be afforded complete access to the Mine, Mine records, accounting and financial records, installations, tax returns and operations of SABINE and the right to inspect the Mine, provided that the exercise of such rights does not interfere with the operation of the Mine and that the

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rima\3rd rima final 12-19-08.doc

TRUE AND CORRECT COPY

1    exercise of such rights shall be at the sole risk, cost and expense of SWEPCO.   It is

2    agreed that the personnel and employees of SABINE engaged in the mining are solely

3    the employees of SABINE and that SWEPCO, in the exercise of its right of access and

4    inspection or otherwise, shall have no right to issue instructions to, make demand of, or

5    direct in any way the daily work and daily activities of SABINE's employees.

6                               **ARTICLE XXIII**
7                        **Limitations of SABINE Functions**

8          Until this Agreement expires or is terminated, SABINE shall be chartered as a

9    single purpose corporation to perform, pursuant to this Agreement, the duties and

10   obligations hereof and shall not perform any work or services, enter into any

11   employment contracts, enter into any agreements with third-parties without SWEPCO's

12   advance approval, undertake any obligations or liabilities, or expend any funds, or

13   engage in any activities, except those which are pursuant this Agreement.

14         Without first obtaining SWEPCO's approval, SABINE shall not purchase or

15   otherwise acquire any real property interests including lignite or other mineral leases

16   and land that would in any way conflict with the interests of SWEPCO.

17                               **ARTICLE XXIV**
18                               **Assignment**

19         Either party may assign this Agreement and its rights hereunder to its parent

20   company or any Affiliate or subsidiary of its parent company or of itself, and only to such

21   a party, without the consent of the other party.  Otherwise, this Agreement may not be

22   assigned wholly or in part by either party without the written consent of the other party,

23   which consent shall not be unreasonably withheld.  No assignment shall release the

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

TRUE AND CORRECT COPY

1   assignor from its financial responsibility hereunder, unless expressly agreed to in writing

2   by the other party and its assignees.  Subject to the foregoing limitations, all of the

3   provisions of this Agreement shall inure to the benefit of and be binding upon the parties

4   hereto, and their successors and assigns.


5                                    **ARTICLE XXV**
6                                    **Interpretation**

7           This Agreement shall be governed by, and construed and interpreted in

8   accordance with, the internal laws of the State of Texas without giving effect to the

9   conflict of laws and principles thereof.  The topical headings used in this Agreement

10  have been inserted as a matter of convenience of reference only and shall not control or

11  affect the meaning or construction of any of the terms and provisions of this Agreement.

12  As used herein, any gender shall include any other gender, the singular shall include

13  the plural, and the plural shall include the singular, wherever appropriate.


14                                   **ARTICLE XXVI**
15                                   **Severability**

16          The invalidity or unenforceability of any particular provision of this Agreement

17  shall not affect the other provisions hereof unless it substantially and adversely affects

18  the value of this Agreement to one of the parties; and in the absence of any such

19  substantial and adverse effect, this Agreement shall be construed in all respects as if

20  such invalid or unenforceable provision were omitted.

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\tables\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

## ARTICLE XXVII
### Entire Agreement

3    This Agreement constitutes the entire agreement between SWEPCO and

4    SABINE and supersedes all other prior negotiations, undertakings, notices, memoranda

5    and agreements between SWEPCO and SABINE, whether oral or written, with respect

6    to the subject matter hereof; provided, however, the parties recognize that the

7    performance of this Agreement is subject to all necessary regulatory approvals, and that

8    in the event regulatory approval is required for the performance by SWEPCO of its

9    payment obligations hereunder, SABINE shall not be required to incur any Loan or

10   Lease Obligation until such approval is obtained, and further provided, however, that all

11   liabilities and obligations of SWEPCO and SABINE which have accrued prior to the

12   effective date of this Agreement shall survive until satisfied or discharged or until the

13   responsible party has been released therefrom.

## ARTICLE XXVIII
### Amendments

16   Any modification or amendment of the terms and provisions of this Agreement

17   shall be valid and effective only if and when made in writing and duly executed on

18   behalf of the parties hereto.

## ARTICLE XXIX
### Counterparts

21   The Agreement may be executed in any number of counterparts, each of which,

22   when executed and delivered, shall be an original, but all of which shall collectively

23   constitute one and the same instrument.

63

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

TRUE AND CORRECT COPY

1
2

**ARTICLE XXX**
**Waiver of Remedies**

3    The failure of either SWEPCO or SABINE to insist in any one or more instances

4    upon strict performance of any of the provisions of this Agreement or to take advantage

5    of any of its rights hereunder shall not be construed as a waiver of any such provisions

6    or the relinquishment of any such rights, but the same shall continue and remain in full

7    force and effect.


8
9

**ARTICLE XXXI**
**Representations, Warranties and Covenants**

10    (a)    Representations and Warranties of SABINE.    SABINE represents and

11    warrants that:

12        (i)    it is a corporation duly organized and validly existing in good

13        standing under the laws of the State of Nevada, is duly qualified to do business in

14        the State of Texas and has all requisite corporate power and authority to enter

15        into this Agreement and to perform its obligations hereunder;

16        (ii)    there is no action, proceeding or investigation pending, or, to the

17        best knowledge of SABINE, threatened against it, and there is no term of its

18        charter, by-laws, or any mortgage, indenture, contract, agreement, instrument,

19        judgment, decree, order, statute, rule or regulation to which SABINE or any of its

20        affiliates is a party or by which it is bound, which in any way prevents or

21        interferes with or adversely affects the entering into by it of this Agreement, or the

22        validity of this Agreement as to it, or the carrying out by it of the terms or

23        provisions of this Agreement;

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

1              (iii)    no approval, action, waiver or consent of any governmental body is

2       required for the execution and delivery of this Agreement by SABINE (or, if

3       required, all of the same have been obtained), and SABINE will use its best

4       efforts to obtain any governmental approvals, actions, waivers or consents of any

5       governmental body which are or may be required for the performance by

6       SABINE of this Agreement; and

7              (iv)    this Agreement has been duly and validly authorized by all

8       necessary corporate action and when executed and delivered will constitute a

9       valid and binding agreement of SABINE.

10     (b)    <u>Representations and Warranties of SWEPCO</u>.  SWEPCO represents and

11  warrants that:

12              (i)    it is a corporation duly organized and validly existing in good

13     standing under the laws of the State of Delaware, is duly qualified to do business

14     in the State of Texas and has all requisite corporate power and authority to enter

15     into this Agreement and to perform its obligations hereunder;

16             (ii)    there is no action, proceeding or investigation pending, or to the

17     best knowledge of SWEPCO threatened against it, and there is no term of its

18     charter, by-laws, or any mortgage, indenture, contract, Agreement, instrument,

19     judgment, decree, order, statute, rule or regulation to which SWEPCO or any of

20     its affiliates is a party or by which it is bound, which in any way prevents or

21     interferes with or adversely affects the entering into by it of this Agreement, or the

22     validity of this Agreement as to it, or the carrying out by it of any of the terms or

23     provisions of this Agreement;

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

TRUE AND CORRECT COPY

1              (iii)    no approval, action, waiver or consent of any governmental body is

2        required for the execution and delivery of this Agreement by SWEPCO (or, if

3        required, all of the same have been obtained), and SWEPCO will use its best

4        efforts to obtain any governmental approvals, actions, waivers or consents of any

5        governmental body which are or may be required for the performance by

6        SWEPCO of this Agreement;

7              (iv)    this Agreement has been duly and validly authorized by all

8        necessary corporate action and when executed and delivered will constitute a

9        valid and binding agreement of SWEPCO;

10             (v)     that to the best of its knowledge it owns, leases or otherwise

11       controls the lignite, including surface mining rights, which will be mined and

12       delivered by SABINE hereunder.  SWEPCO agrees to use its best efforts to

13       maintain in effect during the term of this Agreement all ownership, leasehold or

14       other rights with respect to such lignite which are necessary for SABINE to mine

15       and deliver the lignite covered by this Agreement, and shall indemnify and hold

16       SABINE harmless from and against any and all claims, demands, actions,

17       causes of action by and liability to third parties, excluding North American Coal,

18       arising out of SWEPCO's failure to maintain such rights.

19             (c)     Covenants of SWEPCO.  SWEPCO hereby covenants and agrees

20       that in the event any Loan or Lease Obligation is determined or declared void or

21       unenforceable by any court or regulatory authority due to the fact that SABINE is

22       determined to be a public utility within the meaning of any Federal or Texas,

23       Louisiana or Arkansas statute, or because of the failure of SWEPCO to obtain

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd clma\3rd clma final 12-19-08.doc

TRUE AND CORRECT COPY

1    any regulatory approval necessary to permit the performance by it of its

2    obligations hereunder, SWEPCO shall nevertheless continue to make payments

3    in respect thereof as if such determination, declaration or failure had not

4    occurred.

5    **ARTICLE XXXII**
6    **Short Form Supplement**

7    If needed or requested by either party for purposes of recording, permitting, filing

8    or any other valid reason, the parties hereto shall execute a short form supplement to

9    this Agreement which shall contain the pertinent provisions hereof in mutually

10   satisfactory detail.

11   **ARTICLE XXXIII**
12   **Equal Employment Opportunity**

13   There is attached hereto as "Supplement A" and made a part hereof that certain

14   instrument entitled "CERTIFICATION FOR EMPLOYMENT OPPORTUNITIES

15   PROGRAMS FOR MINORITIES AND VETERANS". SABINE agrees to fully comply

16   with said Supplement A, and throughout said Supplement A, whenever reference is

17   made to "Contractor" it is understood that same refers to SABINE.

18

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2009

g:\legal\sabine\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

1    IN WITNESS WHEREOF, the parties hereto, with intent to be legally bound

2    hereby, have caused this instrument to be executed by their duly authorized officers on

3    the date first above written.

4

5    WITNESSES:                          **SOUTHWESTERN     ELECTRIC     POWER**
6                                        **COMPANY by AMERICAN ELECTRIC POWER**
7                                        **SERVICE CORPORATION, its agent**
8
9
10                                       By:_____
11                                       Title:_____Vice President_____
12                                       Date:____12-31-08_____
13
14
15   WITNESSES:                          **THE SABINE MINING COMPANY**
16
17
18                                       By:_____
19                                           Rick J. Ziegler, President
20                                       Date:____12-22-2008_____
21
22   g:\legal\sabine\3rd rlma\3rd rlma final 12-19-08.doc
23
24
25

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
                                        EFFECTIVE JANUARY 1, 2008

g:\legal\sabine\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

## ACKNOWLEDGMENTS

THE STATE OF *Ohio*

COUNTY OF *Franklin*

BEFORE ME, the undersigned authority, on this day personally appeared *Timothy K Light*, known to me to be the person and agent whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said ~~AMERICAN ELECTRIC POWER SERVICE CORPORATION, a~~ ~~corporation, as agent for~~ SOUTHWESTERN ELECTRIC POWER COMPANY, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this *31st* day of *December*, 2008.

_____
NOTARY PUBLIC
My Commission Expires:

DAVID M. COHEN
NOTARY PUBLIC, STATE OF OHIO
LIFETIME COMMISSION

THE STATE OF TEXAS

COUNTY OF HARRISON

BEFORE ME, the undersigned authority, on this day personally appeared Rick J. Ziegler, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said THE SABINE MINING COMPANY, a corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this *22nd* day of *December*, 2008.

_____
NOTARY PUBLIC
My Commission Expires: *9-24-2009*

CATHERINE L. PIERCE
Notary Public State of Texas
COMM. EXP. 9-24-2009

69

3RD RESTATEMENT OF LIGNITE MINING AGREEMENT
EFFECTIVE JANUARY 1, 2008

TRUE AND CORRECT COPY

## SUPPLEMENT "A"

# CERTIFICATION FOR EMPLOYMENT OPPORTUNITIES PROGRAMS

## FOR MINORITIES AND VETERANS

I.  <u>EQUAL OPPORTUNITY CLAUSE SUPPLEMENT TO CONTRACTS AND PURCHASE ORDERS</u>

A.    The Sabine Mining Company (hereinafter called "Contractor") is aware of and is fully informed of Contractor's responsibilities under Executive Order 11246 and shall file compliance reports as required by Section 203 of Executive Order 11246 and otherwise comply with the requirements of such order.

B.    Contractor agrees to the following provisions of Section 202 of Executive Order 11246:

1.    Contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin.  Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, color, religion, sex or national origin.  Such action shall include but not be limited to the following:  Employment, upgrading, demotion or transfer; recruit or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.  Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

2.    Contractor will, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

3.    Contractor will send to each labor union or representative of workers with which it has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the Contractor's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

Supplement "A"

S-1

g:\legal\sabine\3rd clma\3rd clma final 12-19-06.doc

4.     Contractor will comply with all provisions of Executive Order No. 11246 and of the rules, regulations and relevant orders of the Secretary of Labor.

5.     Contractor will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965 and by the rules, regulations and orders of the Secretary of Labor, or pursuant thereto, and will permit access to its books, records and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations and orders.

6.     In the event of the Contractor's noncompliance with the nondiscrimination clauses of Executive Order No. 11246 or with any of such rules, regulations or orders, contracts issued subject thereto may be canceled, terminated or suspended, in whole or in part, and the Contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965 or by rule, regulation or order of the Secretary of Labor or as otherwise provided by law.

7.     Contractor will include the provisions of Paragraphs 1 through 7 in every subcontract or purchase order unless exempted by rules, regulations or orders of the Secretary of Labor, issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. Contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions, including sanctions for noncompliance; provided, however, that in the event Contractor becomes involved in or is threatened with litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Contractor may request the United States to enter into such litigation to protect the interests of the United States.

C.     Certification of Nonsegregated Facilities

Contractor certifies that (1) segregated facilities are not and will not be maintained or provided for its employees at any of its establishments, (2) such employees are not and will not be permitted to perform their services at any location under its control where segregated facilities are maintained, and (3) Contractor is aware of and understands that any breach of the foregoing is a violation of the Equal Opportunity Clause of Executive Order 11246. "Segregated Facilities" as used herein means any waiting rooms, work areas,

Supplement "A"

g:\legal\sublast\3rd rlmak\3rd rlmp final 12-19-08.doc

TRUE AND CORRECT COPY

rest rooms and wash rooms, restaurants and other eating rooms, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, religion, color or national origin, because of habit, local customs or otherwise.

Contractor further agree, except where it has obtained identical certifications from proposed subcontractors for specific time periods, that it will (1) obtain identical certifications from proposed subcontractors for specific time periods, (2) obtain identical certification from proposed subcontractors prior to the award of subcontracts exceeding $10,000, which are not exempt from the provisions of the Equal Opportunity Clause, (3) retain such certifications in its files, and (4) forward the following notice to prospective subcontractors:

"NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATION OF NONSEGREGATED FACILITIES. A Certificate of Nonsegregated Facilities, as required by Section 60-1.8 of Title 41 of the Code of Federal Regulations, must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause. The certification may be submitted either for each subcontract or for all subcontracts during a specified period, i.e., quarterly, semi-annually or annually.

NOTE: The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001."

II.   STANDARD FORM 100 (EEO-1) AND AFFIRMATIVE ACTION PROGRAM

Contractor agrees as follows:

1.   To file a complete and accurate report on Standard Form 100 (EEO-1) within thirty (30) days of the date of contract or purchase order award unless such a report has been filed in the last twelve (12) months and agrees to file such reports annually, as required by Section 60-1.7 of Title 41 of the Code of Federal Regulations; and

2.   Affirms that it has developed and is maintaining currently an affirmative action program at each of its establishments, as prescribed in Section 60-1.40 of Title 41 of the Code of Federal Regulations, or that it will be within 120 days of receipt of any contract or purchase order of $50,000 or more.

Supplement "A"

TRUE AND CORRECT COPY

III.     THE VIETNAM ERA VETERAN'S READJUSTMENT ASSISTANCE ACT OF 1974

If the value of any contract or purchase order is $10,000 or more, the Contractor agrees and certifies that it is and will remain in compliance with the affirmative action in the employment and advancement of qualified disabled veterans of the Vietnam era. The contract clause is incorporated herein by reference.

IV.     THE REHABILITATION ACT OF 1973

If the value of any contract or purchase order is $2,500 or more, Contractor agrees and certifies that it is and will remain in compliance with the affirmative action clause set forth in 41 CFR 60-741.4 (to employ and advance in employment qualified handicapped individuals) and incorporated herein by reference.

Dated this _____ day of _____,2008.

THE SABINE MINING COMPANY

By:_____
           Rick J. Ziegler
           President

Supplement "A"

g:\legal\sabine\3rd rinm\3rd clms final 12-19-08.doc

TRUE AND CORRECT COPY



Area of Mutual Interest

EXHIBIT A
SWEPCO'S RESERVES

Marshall South Mine Area

South Hallsville Mine Area

Rusk County Mine Area

TRUE AND CORRECT COPY



## NORTH AMERICAN COAL CORPORATION

### SABINE MINE



*Rick J. Ziegler*
*President*
*Direct Telephone No. 903-668-5500*

October 14, 2009
SM-8332

Mr. Gregory A. Wright
Manager, Lignite and Business Services
American Electric Power Company
2396 Farm Road 3251
Hallsville, TX 75650

Dear Greg:

**SUBJECT:   THIRD RESTATEMENT OF LIGNITE MINING AGREEMENT EFFECTIVE JANUARY 1, 2008 BETWEEN SOUTHWESTERN ELECTRIC POWER COMPANY ("SWEPCO") AND THE SABINE MINING COMPANY ("SABINE") ("RLMA")**

The Bureau of Economic Analysis of the U.S. Department of Commerce has revised the IPD-GPD from a base of 2000=100 to a base of 2005=100. Article IX, Section 2(a)(iii)(e) and Article IX, Section 2(d)(ii) of the RLMA state "If the IPD-GDP Index or any substitute index is changed in the future to use some base other than the base of 2000=100, for the purposes hereof, the IPD-GDP or any substitute index, as the case may be, shall be adjusted so as to be in correct relationship to the base of 2000=100, or some other alternative base which is mutually agreeable to SWEPCO and SABINE."

Representatives of Sabine have discussed with members of your staff the change in the base for the IPD-GDP. Based on these discussions, we have the calculated the new base of the IPD-GDP Index to be 107.961 (2005=100) for the Management Fee and general and administrative costs adjustments. The attached revised Exhibit "B" and revised Exhibit "D" show how the adjustments of the Management Fee and general and administrative costs will be calculated effective for 2009 and going forward.

If you are in agreement with the foregoing calculation methodology and revised Exhibits "B" and "D", please sign both originals of this letter, keep one for your files, and return the other to me. Please feel free to contact me if you have any questions or comments on this matter.

Sincerely,

THE SABINE MINING COMPANY

Rick J. Ziegler
President

RJZ/cp
Enclosure

cc:   Lisa Mayfield
      Corporate Records
      File

09- 600 .05. 10 . 05 . 06

Mr. G. A. Wright
October 14, 2009
Page 2

SUBJECT:    THIRD RESTATEMENT OF LIGNITE MINING AGREEMENT EFFECTIVE JANUARY 1,
2008 BETWEEN SOUTHWESTERN ELECTRIC POWER COMPANY ("SWEPCO") AND
THE SABINE MINING COMPANY ("SABINE") ("RLMA")

THE FOREGOING IS AGREED TO AND ACCEPTED BY:
SOUTHWESTERN ELECTRIC POWER COMPANY

| | |
|---|---|
| BY: | _Gregory a Wright_ |
| TITLE: | _MGR-Lignite & Business Services_ |
| DATE: | _11/9/09_ |

cc:    Gene Beener (w/enclosure)
Doug Darby (w/enclosure)
Tom Koza (w/enclosure)
Marguerite Mills (w/enclosure)

TRUE AND CORRECT COPY

# EXHIBIT "B"
## MANAGEMENT FEE ESCALATION EXAMPLE

Management Fee - Beginning January 1, 2003 pursuant to Article IX, Section 2 (c):
Fee/Ton < 2/8 mmtpy          $1.2045
Fee/Ton > 2.8 mmtpy          $1.0043

Establishment of relationship between 2000=100 Base Indexes and 2005=100 Base Indexes

Conversion Table:

| | | | |
|---|---|---|---|
| Avg.Qtr.4 2008 and Qtrs.1-2 2009 (2000=100) | = | 123.555 | = | 1.0145 (Escalation through |
| Base Index (Avg Q4 2007, Q1-3 2008 2000=100) | | 121.795 | | Qtr 2 2009) |

Avg.Qtr.4 2008 and Qtrs. 1-2 2009 (2005=100)    =    109.522    [(109.172+109.691+109.702)/3]

New Base Index Average (2005=100)    =    109.522    =    107.961
                                             1.0145

| IPDGDP | Year | Base Index (2000=100) | Year | Base Index (2000=100) | Base Index (2005=100) | Year | Base Index (2005=100) |
|---|---|---|---|---|---|---|---|
| Qtr 4 | 2007 | 120.788 | 2008 | 123.161 | | 2008 | 109.172 |
| Qtr 1 | 2008 | 121.313 | 2009 | 123.746 | | 2009 | 109.691 |
| Qtr 2 | 2008 | 121.916 | 2009 | 123.758 | | 2009 | 109.702 Prelim |
| Qtr 3 | 2008 | 123.161 | 2009 | | | 2009 | 109.802 Estimated |
| Total | | 487.178 | | 370.665 | | | 438.367 |
| Avg | | 121.795 | | 123.555 | 107.961 | | 109.592 |

Year-end adjustment based on average of Qtr 4 2008 & Qtrs 1-3 2009:

Adjustment Factor          109.592          =    1.0151
                           107.961

Base Management Fee Per Ton Beginning January 1, 2009:
Adjusted Fee/Ton < 2.8 mmtpy          $1.2045    *    1.0151    =    $1.2227
                                      $1.0043    *    1.0151    =    $1.0195

December 2009 Adjustment =

| 2009 Delivered Tonnage | Jan-Nov | December | Annual |
|---|---|---|---|
| Pirkey | 2,971,263 | 185,849 | 3,157,112 |
| Norit | 255,876 | 27,083 | 282,959 |

Management Fee Invoice (Pirkey) as of 11/30/2009 =          $3,543,862.91

2009 Adjusted Management Fee =
((2,800,000*$1.2227)+((3,157,112 - 2,800,000)*$1.0195) =          $3,787,635.68

December 2009 Management Fee =          $243,772.77

Management Fee Invoice (Norit) as of 11/30/2009 =          $277,244.84

2009 Adjusted Management Fee =
(282,959*$1.2227) =          $345,973.97

December 2009 Management Fee =          $68,729.13

TRUE AND CORRECT COPY

**EXHIBIT "C"**

**POST - PRODUCTION
MANAGEMENT FEE SCHEDULE**

| POST-PRODUCTION PERIOD | POST-PRODUCTION MANAGEMENT FEE (DOLLARS) | |
|---|---|---|
| | PER MONTH | ANNUAL |
| YEAR 1 | 80,000 | 960,000 |
| YEAR 2 | 80,000 | 960,000 |
| YEAR 3 | 8,333 | 100,000 |
| YEAR 4 | 4,167 | 50,000 |
| YEAR 5 | 3,333 | 40,000 |
| YEAR 6 | 833 | 10,000 |
| ALL ADDITIONAL YEARS | 833 | 10,000 |

C-1

EXHIBIT "C"

TRUE AND CORRECT COPY



**SABINE MINE**

RECEIVED
NOV 09 2009
MANAGER-LIGNITE

Rick J. Ziegler
President
Direct Telephone No. 903-668-5500

October 14, 2009
SM-8332

Mr. Gregory A. Wright
Manager, Lignite and Business Services
American Electric Power Company
2396 Farm Road 3251
Hallsville, TX 75650

Dear Greg:

**SUBJECT:    THIRD RESTATEMENT OF LIGNITE MINING AGREEMENT EFFECTIVE JANUARY 1,
2008 BETWEEN SOUTHWESTERN ELECTRIC POWER COMPANY ("SWEPCO") AND
THE SABINE MINING COMPANY ("SABINE") ("RLMA")**

The Bureau of Economic Analysis of the U.S. Department of Commerce has revised the IPD-GPD from a base
of 2000=100 to a base of 2005=100. Article IX, Section 2(a)(iii)(e) and Article IX, Section 2(d)(ii) of the RLMA
state "If the IPD-GDP Index or any substitute index is changed in the future to use some base other than the
base of 2000=100, for the purposes hereof, the IPD-GDP or any substitute index, as the case may be, shall be
adjusted so as to be in correct relationship to the base of 2000=100, or some other alternative base which is
mutually agreeable to SWEPCO and SABINE."

Representatives of Sabine have discussed with members of your staff the change in the base for the IPD-
GDP. Based on these discussions, we have the calculated the new base of the IPD-GDP Index to be 107.961
(2005=100) for the Management Fee and general and administrative costs adjustments. The attached revised
Exhibit "B" and revised Exhibit "D" show how the adjustments of the Management Fee and general and
administrative costs will be calculated effective for 2009 and going forward.

If you are in agreement with the foregoing calculation methodology and revised Exhibits "B" and "D", please
sign both originals of this letter, keep one for your files, and return the other to me. Please feel free to contact
me if you have any questions or comments on this matter.

Sincerely,

THE SABINE MINING COMPANY

Rick J. Ziegler
President

RJZ/cp
Enclosure

cc:    Lisa Mayfield
Corporate Records
File

09-600-05.10.05.06

TRUE AND CORRECT COPY

Mr. G. A. Wright
October 14, 2009
Page 2

SUBJECT:   THIRD RESTATEMENT OF LIGNITE MINING AGREEMENT EFFECTIVE JANUARY 1,
2008 BETWEEN SOUTHWESTERN ELECTRIC POWER COMPANY ("SWEPCO") AND
THE SABINE MINING COMPANY ("SABINE") ("RLMA")


THE FOREGOING IS AGREED TO AND ACCEPTED BY:
SOUTHWESTERN ELECTRIC POWER COMPANY

| BY: | _Gregory A Wright_ |
|-------|------------------------------------|
| TITLE: | MGR - Lignite & Business Services |
| DATE: | 11/9/09 |

cc:   Gene Beener (w/enclosure)
Doug Darby (w/enclosure)
Tom Koza (w/enclosure)
Marguerite Mills (w/enclosure)

TRUE AND CORRECT COPY

# EXHIBIT "D"
## GENERAL AND ADMINISTRATIVE COST ADJUSTMENT EXAMPLE

Corporate G&A - Beginning January 1, 2009 pursuant to Article IX, Section 2 (c):

$785,472

Establishment of relationship between 2000=100 Base Indexes and 2005=100 Base Indexes

**Conversion Table:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Avg.Qtr.4 2008 and Qtrs.1-2 2009 (2000=100) | | | = | 123.555 | = | | 1.0145 (Escalation through |
| Base Index (Avg Q4 2007, Q1-3 2008 2000=100) | | | | 121.795 | | | Qtr 2 2009) |
| Avg.Qtr.4 2008 and Qtrs. 1-2 2009 (2005=100) | | | = | 109.522 | | | [(109.172+109.691+109.702)/3] |
| New Base Index Average (2005=100) | | | = | 109.522 | = | 107.961 | |
| | | | | 1.0145 | | | |

| IPDGDP | Year | Base Index (2000=100) | Year | Base Index (2000=100) | New Base Index Avg (2005=100) | Year | Base Index (2005=100) | |
|---|---|---|---|---|---|---|---|---|
| Qtr 4 | 2007 | 120.788 | 2008 | 123.161 | | 2008 | 109.172 | |
| Qtr 1 | 2008 | 121.313 | 2009 | 123.746 | | 2009 | 109.691 | |
| Qtr 2 | 2008 | 121.916 | 2009 | 123.758 | | 2009 | 109.702 | Prelim |
| Qtr 3 | 2008 | 123.161 | 2009 | | | 2009 | 109.802 | Estimated |
| | Total | 487.178 | | 370.665 | | | 438.367 | |
| | Avg | 121.795 | | 123.555 | 107.961 | | 109.592 | |

Year-end adjustment based on average of Qtr 4 2008 & Qtrs 1-3 2009:

| Adjustment Factor | 109.592 | = | 1.0151 |
|---|---|---|---|
| | 107.961 | | |

Base Corporate G&A beginning January 1, 2009:

| Adjusted Corporate G&A | $785,472.09 | * | 1.0151 | = | $797,332.72 |
|---|---|---|---|---|---|

December 2009 Adjustment =

| | |
|---|---|
| Corporate G&A invoiced as of 11/30/2009 = | $742,500.00 |
| December 2009 Corporate G&A = | $54,832.72 |

TRUE AND CORRECT COPY

# EXHIBIT "E"

## INVOICE CALCULATION PROCEDURE FOR LIGNITE DELIVERED
## BY SABINE FOR USE AT SWEPCO'S PLANT

<u>January through November Invoices</u>

The amount of SABINE's invoice for lignite delivered by SABINE for use at SWEPCO's Plant shall be determined in accordance with the following formula:

$$I = B_{A\,(current\,month)} \times \frac{\sum\limits_{January}^{\substack{current \\ month}} CPLL_A + \sum\limits_{\substack{future \\ month(s)}}^{December} CPLL_P}{\sum\limits_{January}^{\substack{current \\ month}} B_A + \sum\limits_{\substack{future \\ month(s)}}^{December} B_P} + \left( MF \times T_{A\,(current\,month)} \right)$$

Where:

| | | |
|---|---|---|
| past month(s) | = | the month(s) preceding the month under consideration |
| current month | = | the month under consideration |
| future month(s) | = | the remaining month(s) of the current year |
| I | = | Invoice amount for the current month (expressed in Dollars ($)) for lignite delivered by SABINE for use at SWEPCO's Plant |
| $CPLL_A$ | = | Actual monthly Cost of Production (as defined in Article IX, Section 2(a) of the RLMA) plus actual monthly Loan and Lease Obligations (as defined in Article I, clause (s) of the RLMA) (expressed in Dollars ($)) plus deferral balances from previous months for lignite delivered by SABINE for use at SWEPCO's Plant. |
| $CPLL_P$ | = | Projected monthly Cost of Production (as defined in Article IX, Section 2(a) of the RLMA) plus projected monthly Loan and Lease Obligations (as defined in Article I, clause (s) of the RLMA) for lignite delivered by SABINE for use at SWEPCO's Plant, which amounts shall be updated by SABINE each month to reflect SABINE's best estimate of the Cost of Production and Loan and Lease Obligations to be incurred by SABINE during the balance of the current year (expressed in Dollars ($)) for lignite delivered by SABINE for use at SWEPCO's Plant |

E-1

EXHIBIT "E"

TRUE AND CORRECT COPY

$B_A$ = Actual mmBtus (as defined in Article I, clause (w) of the RLMA) of lignite delivered by SABINE for use at SWEPCO's Plant during the month(s) under consideration

$B_P$ = Projected monthly mmBtus (as defined in Article I, clause (w) of the RLMA) of lignite to be delivered by SABINE for use at SWEPCO's Plant during the balance of the current year, which amounts shall be updated by SABINE from time to time to reflect SABINE's best estimate of the mmBtus of lignite to be delivered by SABINE for use at SWEPCO's Plant during the balance of the current year

MF = Management Fee (as defined in Article IX, Section 2(c) of the RLMA) (expressed in Dollars ($) per Ton) for lignite delivered by SABINE for use at SWEPCO's Plant

$T_A$ = Actual Tons (as defined in Article I, clause (nn) of the RLMA) of lignite delivered by SABINE for use at SWEPCO's Plant during the month under consideration

December Invoice

For the month of December of each year, the amount of SABINE's invoice for lignite delivered by SABINE for use at SWEPCO's Plant shall be determined in accordance with the following formula:

$$I = \left( \sum_{January}^{December} CPLL_A - \sum_{January}^{November} PI \right) + \left( MF \times T_A \right)$$

where:

I = Invoice amount (expressed in Dollars ($)) for lignite delivered by SABINE for use at SWEPCO's Plant

$CPLL_A$ = Actual monthly Cost of Production (as defined in Article IX, Section 2(a) of the RLMA) plus actual monthly Loan and Lease Obligations (as defined in Article I, clause (ss) of the RLMA) (expressed in Dollars ($)) for lignite delivered by SABINE for use at SWEPCO's Plant

PI = Prior monthly invoice amounts (excluding Management Fee) for the current year (expressed in Dollars ($)), plus deferral balances from previous months, for lignite delivered by SABINE for use at SWEPCO's Plant

E-2

EXHIBIT "E"

TRUE AND CORRECT COPY

MF    =    Management Fee (as defined in Article IX, Section 2(c) of the RLMA) (expressed in Dollars ($) per Ton) for lignite delivered by SABINE for use at SWEPCO's Plant

$T_A$    =    Actual Tons (as defined in Article I, clause (nn) of the RLMA) of lignite delivered by SABINE for use at SWEPCO's Plant during the month of December

All of the figures used in the above described calculations shall be taken from the then most current Normalized Cash Flow Summary prepared by SABINE.

Two examples of this levelized billing method are set forth below. The numbers assumed in these examples and the tables referenced therein are for illustrative purposes only and are not intended to relate to actual circumstances or to be used in actual calculations.

E-3

g:\legal\rushbin\3rd rlma\3rd rlma final 12-19-08.doc

TRUE AND CORRECT COPY

# EXAMPLE CALCULATION
# FOR THE MONTH OF JANUARY

Assume the figures in Table 1 to Exhibit E are taken from the most current Normalized Cash Flow Summary prepared by SABINE for the year under consideration and assume a Management Fee of $1.01 per Ton for the Tons delivered by SABINE for use at SWEPCO's Plant in January.

As shown in Table 1:

$$\sum_{January}^{January} CPLL_A = \$5,087,705$$

Where $CPLL_A$ = Actual monthly Cost of Production plus actual monthly Loan and Lease Obligations plus deferral balances for lignite delivered by SABINE for use at SWEPCO's Plant

$$\sum_{February}^{December} CPLL_P = \$46,357,675$$

Where $CPLL_P$ = Projected monthly Cost of Production plus projected monthly Loan and Lease Obligations for lignite delivered by SABINE for use at SWEPCO's Plant

$$\sum_{January}^{January} B_A = 4,920,411 \; mmBtus$$

Where $B_A$ = Actual mmBtus of lignite delivered by SABINE for use at SWEPCO's Plant

$$\sum_{February}^{December} B_P = 44,835,909 \; mmBtus$$

Where $B_P$ = Projected monthly mmBtus of lignite to be delivered by SABINE for use at SWEPCO's Plant

$T_{A \, (January)}$ = 364,313 Tons

Where $T_A$ = Actual Tons of lignite delivered by SABINE for use at SWEPCO's Plant

E-4

TRUE AND CORRECT COPY

EXHIBIT "E"

g:\legal\sabine\3rd amend\3rd amend final 12-19-08.doc

For the months of January through November of each year, the amount of SABINE's invoice for lignite delivered by SABINE for use at SWEPCO's Plant is determined in accordance with the following formula:

$$I = B_{A \, (current \, month)} \times \frac{\sum\limits_{January}^{\substack{current \\ month}} CPLL_A + \sum\limits_{\substack{future \\ month \, (s)}}^{December} CPLL_P}{\sum\limits_{January}^{\substack{preceding \\ month}} B_A + \sum\limits_{\substack{future \\ month \, (s)}}^{December} B_P} + \left( MF \times T_{A \, (current \, month)} \right)$$

$$I = 4,920,411 \, mmBtus \times \frac{\$5,087,705 + \$46,357,675}{4,920,411 \, mmBtus + 44,835,909 \, mmBtus} + \left( \$1.01 / Ton \times 364,313 \, Tons \right)$$

$$= \$5,456,317$$

E-5

EXHIBIT "E"

## EXAMPLE CALCULATION
## FOR THE MONTH OF DECEMBER

Assume the figures in Table 1 to Exhibit E are taken from the most current Normalized Cash Flow Summary prepared by SABINE for the year under consideration and assume a Management Fee of $0.84 per Ton for the Tons delivered by SABINE for use at SWEPCO's Plant in December.

As shown in Table 1:

$$\sum_{January}^{December} CPLL_A = \$54,951,387$$

> Where $CPLL_A$ = Actual monthly Cost of Production plus actual monthly Loan and Lease Obligations for lignite delivered by SABINE for use at SWEPCO's Plant

$$\sum_{January}^{November} PI = \$49,606,335$$

> Where $PI$ = Prior monthly invoice amounts (excluding Management Fee) for the current year, plus deferral balances from previous months, for lignite delivered by SABINE for use at SWEPCO's Plant

$T_A$ = 332,500 *Tons*

> Where $T_A$ = Actual Tons of lignite delivered by SABINE for use at SWEPCO's Plant in December

For the month of December of each year, the amount of SABINE's invoice for lignite delivered by SABINE for use at SWEPCO's Plant is determined in accordance with the following formula:

$$I = \left( \sum_{January}^{December} CPLL_A - \sum_{January}^{November} PI \right) + \left( MF \times T_A \right)$$

$$I = \$54,951,387 - \$49,606,335 + \left( \$0.84 / Ton \times 332,500 \, Tons \right)$$

$$= \$5,638,423$$

E-6

EXHIBIT "E"

TRUE AND CORRECT COPY

Table 1 to Exhibit "E"

| January Calculation | Tons | BTUS | Invoice Amt. | $/mmbtu | Mgmt Fee | Deferred Balance | Actual Cost | Inv Jeff (w/o Fee) | $/mmbtu |
|---|---|---|---|---|---|---|---|---|---|
| Annual Forecast | 3,716,400 | 49,756,320 | $5,051,587.00 | $1.11 | 3,906,207.00 | 0.00 | $1,445,380.00 | $5,087,704.97 | $1.03 |
| January Actual | 364,313 | 4,920,411 | $5,455,316.86 | $1.11 | 398,811.69 | 1,373,284.13 | 3,714,426.84 | 5,087,704.97 | $1.03 |
| Feb - Dec Forecast | 3,352,087 | 44,835,909 | 49,595,270.14 | | 3,237,595.11 | (1,373,284.13) | 47,720,959.16 | 46,357,678.03 | |

Jan Bus | 4,920,411
Annual Prod Cost/Annual Bus $ | 1.03
January Prod Cost | 5,087,705
January Mgmt Fee | 368,612
Total January Invoice | 5,456,317

| December Calculation | Tons | BTUS | Invoice First | $/mmbtu | Mgmt Fee | Deferred Balance | Actual Cost | Inv Jeff (w/o Fee) | $/mmbtu |
|---|---|---|---|---|---|---|---|---|---|
| January | 364,313 | 4,920,411 | $5,455,316.86 | $1.11 | $368,611.69 | $1,373,284.13 | 3,714,426.84 | 5,087,704.97 | $1.03 |
| February | 318,590 | 4,300,084 | $4,769,008.36 | $1.11 | $322,713.61 | ($691,561.10) | 5,137,847.85 | $4,449,286.75 | $1.03 |
| March | 334,259 | 4,444,391 | $4,920,039.79 | $1.11 | $334,000.50 | ($3349,410.38) | 4,831,505.27 | $4,582,054.89 | $1.03 |
| April | 169,760 | 2,241,775 | $2,476,328.22 | $1.10 | $171,785.43 | ($1,762,757.89) | 4,058,642.71 | $2,304,543.82 | $1.03 |
| May | 316,146 | 4,221,494 | $4,656,890.77 | $1.09 | $317,552.92 | ($960,558.60) | 5,209,584.45 | $4,239,037.55 | $1.03 |
| June | 354,259 | 4,711,645 | $5,205,549.75 | $1.12 | $356,439.26 | ($3784,024.75) | 5,854,135.24 | $4,900,110.49 | $1.04 |
| July | 347,347 | 4,591,927 | $5,090,314.70 | $1.11 | $351,445.69 | ($415,028.17) | 5,153,867.18 | $4,738,869.01 | $1.03 |
| August | 374,076 | 4,908,625 | $5,355,836.15 | $1.09 | $378,493.10 | $104,922.37 | 4,872,423.66 | $4,977,346.03 | $1.03 |
| September | 399,526 | 4,023,532 | $4,417,927.14 | $1.10 | $298,476.10 | $260,072.28 | 3,915,576.76 | $4,119,449.04 | $1.02 |
| October | 337,406 | 4,563,127 | $5,325,819.00 | $1.17 | $284,864.00 | $1,079,594.00 | 3,982,661.00 | $5,042,255.00 | $1.10 |
| November | 339,111 | 4,632,250 | $5,404,744.00 | $1.17 | $285,108.00 | $987,117.00 | 4,151,919.00 | $5,118,658.00 | $1.10 |
| December | 347,719 | 4,800,428 | $5,608,423.00 | | $289,370.32 | ($1,196,989.11) | 4,155,063.37 | $5,345,052.48 | $1.11 |
| | 3,910,488 | 52,383,917 | $58,721,345.72 | | $3,759,808.39 | $0.00 | 54,951,367.33 | $54,951,367.33 | $1.05 |

Jan-Nov Invoiced Cost | $49,606,335
Jan-Dec Invoiced Cost | $54,951,387
December Invoiced Cost | $5,345,052
December Mgmt Fee | $253,371
Total December Invoice | $5,638,423

Notes: Actual Cost equals Invoice Amount less Management Fee less Deferral Balance
Production Cost equals Invoice Amount less Management Fee
Invoice Amount includes Deferral Balance

October through December are estimates but for purposes of the calculation they will be used as actual.

E-7

g:\legal\mitch\collisdata final 12-19-08.doc

TRUE AND CORRECT COPY

EXHIBIT "F"

## POST-PRODUCTION PERIOD
## GENERAL AND ADMINISTRATIVE COSTS SCHEDULE

|  | POST-PRODUCTION PERIOD GENERAL AND ADMINISTRATIVE COSTS (DOLLARS) | |
|---|---|---|
| POST-PRODUCTION PERIOD | PER MONTH | ANNUAL |
| YEAR 1 | 52,500 | 630,000 |
| YEAR 2 | 52,500 | 630,000 |
| YEAR 3 | 52,500 | 630,000 |
| YEAR 4 | 26,250 | 315,000 |
| YEAR 5 | 13,125 | 157,500 |
| YEAR 6 | 13,125 | 157,500 |
| ALL ADDITIONAL YEARS | 13,125 | 157,500 |

F-1

**EXHIBIT "G"**
**EXAMPLE CALCULATION OF TERMINATION FEE**

If SWEPCO terminates this Agreement pursuant to **Article XX, Section 2** and the reason therefor is not because of a SABINE Default, or is not due to a shutdown of the Mine because of economic reasons, and SWEPCO mines, or causes to be mined, within two (2) years thereafter lignite from SWEPCO's Reserves, then North American Coal shall be entitled to a Termination Fee determined in accordance with the following table, subject to adjustment as hereinafter provided:

| TERMINATION EFFECTIVE DATE: | | | | |
|---|---|---|---|---|
| 2009 | 2010 | 2011 | 2012 | 2013 and Beyond |
| TERMINATION FEE: | | | | |
| $24 Million | $20 Million | $16 Million | $12 Million | $8 Million |

Commencing January 1, 2010, the Termination Fee shall be adjusted effective as of January 1, April 1, July 1, and October 1 of each year based on the percentage change in the value of the IPD-GDP Index from the fourth calendar quarter of 2008.

Example Calculation

Assumptions: Termination Effective Date is July 31, 2012 and recommencement of mining is October 15, 2013

Termination Fee for Year 2012:        $12,000,000.00

IPD-GDP Index (2000=100)          IPD-GDP Index (2000=100)
for 4th Quarter 2008                    for 2nd Quarter 2013
123.122                                139.050

Adjustment Factor:        $\frac{139.050}{123.122}$ =   1.129

Termination Fee for Year 2012:   $12,000,000.00

Adjusted Termination Fee as of October 15, 2013:
$12,000,000.00 x 1.129 = $13,548,000.00 to be paid within sixty (60) days of recommencement of mining, subject to true-up pursuant to Article XX, Section 2, at such time as the final published value of the IPD-GDP Index (2000=100) for the third calendar quarter of 2013 is available.

G-1

g:\legal\sabine\3rd\ttau\3rd ttau final 12-19-08.doc

# EXHIBIT 2

THIS IS A BEST COPY

## SWEPCO TO END COAL OPERATIONS AT TWO PLANTS, UPGRADE A THIRD

November 5, 2020

SHREVEPORT, La., Nov. 5, 2020 – Southwestern Electric Power Co.'s (SWEPCO) compliance plans for two recently revised environmental regulations include retiring the H.W. Pirkey Power Plant in Hallsville, Texas, in 2023 and ceasing coal operations at the Welsh Power Plant at Pittsburg, Texas, in 2028.

SWEPCO, an American Electric Power company (Nasdaq: AEP), will file its compliance plans this month for the U.S. Environmental Protection Agency's (EPA) Coal Combustion Residuals (CCR) rule. The rule applies to the handling and storage of coal ash at each facility. SWEPCO owns 580 megawatts (MW) of generating capacity at Pirkey and 1,053 MW at Welsh.

Flint Creek Power Plant in Gentry, Ark., will continue operations with installation of a dry bottom ash handling system and other facilities that meet the CCR and Effluent Limitation Guidelines (ELG) requirements in 2023. The existing ash pond at this site will be closed and the ash will be sold for beneficial reuse or moved to the plant's regulated onsite landfill. SWEPCO owns 258 MW of the plant capacity.

The John W. Turk Jr. Power Plant (477 MW) in Fulton, Ark., currently meets CCR and ELG standards.

"Our Pirkey and Welsh employees have provided decades of safe and reliable service to SWEPCO customers, which will continue until the transition is complete," said Malcolm Smoak, SWEPCO president and chief operating officer. "We are committed to working with our employees, local leaders and our communities in East Texas to help them manage these transitions," Smoak said.

SWEPCO will discuss transition options with affected employees, which include severance, educational and retraining resources, and other potential job opportunities at SWEPCO and AEP.

"In making these difficult decisions, we have worked to balance the remaining life and economic viability of each of our coal-fueled generating units with other options for delivering power, including renewable energy and natural gas, in a resource mix that benefits our customers and the environment," Smoak said.

The analysis includes the level of investment necessary to comply with the recently revised EPA rules, each plant's remaining operating life, and potential future compliance costs.

SWEPCO will continue to evaluate options for the Welsh Plant, which will cease coal operations in 2028.


### About Southwestern Electric Power Co. (SWEPCO)

SWEPCO, an American Electric Power (AEP: NYSE) company, serves more than 543,000 customers in northwest and central Louisiana, northeast Texas and the Texas Panhandle, and western Arkansas. SWEPCO's headquarters are in Shreveport, La. News releases and other information about SWEPCO can be found at SWEPCO.com. Connect with us at Facebook.com/SWEPCO, Twitter.com/SWEPCOnews, Instagram.com/swepco, Youtube.com/SWEPCOtv, LinkedIn.com/company/swepco and SWEPCOConnections.com.

### About American Electric Power (AEP)

American Electric Power, based in Columbus, Ohio, is focused on building a smarter energy infrastructure and delivering new technologies and custom energy solutions to our customers. AEP's approximately 17,000 employees operate and maintain the nation's largest electricity transmission system and more than 221,000 miles of distribution lines to efficiently deliver safe, reliable power to nearly 5.5 million regulated customers in 11 states. AEP also is one of the nation's largest electricity producers with approximately 30,000 megawatts of diverse generating capacity, including more than 5,300 megawatts of renewable energy. AEP's family of companies includes utilities AEP Ohio, AEP Texas, Appalachian Power (in Virginia and West Virginia), AEP Appalachian Power (in Tennessee), Indiana Michigan Power, Kentucky Power, Public Service Company of Oklahoma, and Southwestern Electric Power Company (in Arkansas, Louisiana, east Texas and the Texas Panhandle). AEP also owns AEP Energy, AEP Energy Partners, AEP OnSite Partners, and AEP Renewables, which provide innovative competitive energy solutions nationwide. For more information, visit aep.com.

TRUE AND CORRECT COPY

MEDIA CONTACTS:
SWEPCO Corporate Communications
Carey Sullivan (318) 673-3458
Peter Main (479) 973-2526

**Related Stories**

TRUE AND CORRECT COPY

# EXHIBIT 3



**SOUTHWESTERN**
**ELECTRIC POWER**
**COMPANY**

*An AEP Company*

Southwestern Electric
Power Company
2398 FM 3251
Hallsville, TX 75650
SWEPCO.com

February 15, 2023
SW-8702

Mr. Andy Hawbaker
President
The Sabine Mining Company
6501 Farm Road 968 West
Hallsville, Texas 75650

SUBJECT:  TRANSITION TO POST-PRODUCTION

Dear Andy:

Southwestern Electric Power Company (SWEPCO) will officially cease operations at the Pirkey Power Plant during March 2023.  Accordingly, mining and delivery of lignite by the Sabine Mining Company (SMC) will cease.

The Third Restatement of the Lignite Mining Agreement (LMA) ARTICLE I provides definitions for the Post-Production Period and Production Period of the Agreement as follows:

(ee) "Post-Production Period" shall mean the period from the date on which the Production Period ends until the end of the term of this Agreement.
(ff) "Production Period" shall mean the period from January 1, 1996 until the mining and delivery of lignite to SWEPCO hereunder ceases and the final Mine closing and Post-Production Period reclamation commences.

As defined, the applicable LMA terms and conditions of the Post-Production Period for SMC begins April 1, 2023.

Sincerely,

Dennis J. Meyer
Dir-Land & Mineral Development

cc:     C. Dewing (e-mail)
        M. Leskowitz (e-mail)

# EXHIBIT 4

CAUSE NO. _____

| | | |
|---|---|---|
| THE SABINE MINING COMPANY AND THE NORTH AMERICAN COAL CORPORATION, | § § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § § | |
| v. | § § § | HARRISON COUNTY, TEXAS |
| SOUTHWESTERN ELECTRIC POWER COMPANY, | § § § | |
| *Defendant.* | § | 71ST JUDICIAL DISTRICT |

## DECLARATION OF ANDREW HAWBAKER

I, Andrew Hawbaker, declare and state as follows:

1.      My name is Andrew Hawbaker.  I am over 21 years of age and am fully competent to testify to the facts set forth in this declaration.  The facts stated within this declaration are based upon my own personal knowledge and are true and correct.

2.      I am the President of the Sabine Mining Company ("Sabine").  I have held that position since January 1, 2016.  In that capacity, I have general management responsibility for the Sabine Mine and its operation, including the goods and services provided to the Pirkey Power Plant.

3.      I have read Plaintiff's Original Petition and Application for Temporary Restraining Order (the "Petition"). I verify the factual statements contained in Paragraphs 10, 11, 12, 15, and 17 of Section V and Paragraphs 38–40 and 42–44 of Section VIII are either within my personal knowledge or are based upon information obtained from other persons or a review of information available to me and others at or working with The Sabine Mining

TRUE AND CORRECT COPY

Company. Based upon the foregoing, I verify that each and every factual statement contained in the paragraphs referenced immediately above are true and correct.

4. Attached to the Petition as Exhibit 1 is a true and correct copy of the Third Restatement of Lignite Mining Agreement. Exhibit 1 was made and kept in the course of Sabine's regularly conducted business activity; was made at or near the time of the events that it record; and was made by a person with knowledge and who reported such knowledge in the regular course of business.

5. Attached to the Petition as Exhibit 2 is a true and correct copy of a November 5, 2020 press release from Southwestern Electric Power Company.

6. Attached to the Petition as Exhibit 3 is a February 15, 2023 letter from Southwestern Electric Power Company.

7. My name is Andrew Hawbaker, my date of birth is 11/17/1972 and my address is 6501 FM 968, Hallsville, Texas 75650. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of April 2023 in Harrison County, Texas.

_Andy Hawbaker_
_____
Andrew Hawbaker

TRUE AND CORRECT COPY

# EXHIBIT 5

TRUE AND CORRECT COPY

CAUSE NO. _____

| | | |
|---|---|---|
| THE SABINE MINING | § | IN THE DISTRICT COURT |
| COMPANY AND THE NORTH | § | |
| AMERICAN COAL | § | |
| CORPORATION, | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | HARRISON COUNTY, TEXAS |
| | § | |
| SOUTHWESTERN ELECTRIC | § | |
| POWER COMPANY, | § | |
| *Defendant.* | § | 71ST JUDICIAL DISTRICT |

## TEMPORARY RESTRAINING ORDER

On this day came on to be heard the application for Temporary Restraining Order of Plaintiffs The Sabine Mining Company ("Sabine") and The North American Coal Corporation ("NACC"). After due notice having been given, the Court, having read and considered Plaintiffs' Original Petition and Application for Injunctive Relief, and the verifying Declaration of Andrew Hawbaker, is of the opinion that it clearly appears from the specific facts set forth in Plaintiffs' Petition and the verifying documents that immediate and irreparable injury will result to Plaintiffs before a hearing can be held, unless Defendant Southwestern Electric Power Company ("Defendant") is immediately restrained as set forth in this Order.

Plaintiffs have alleged causes of action for breach of contract, breach of the duty of good faith and fair dealing, and for declaratory judgment, and have a likelihood of success on the merits of those claims. The facts presented by Plaintiffs demonstrate a likelihood of success that Defendant has breached its contract with Sabine as well as its implied duty of good faith and fair dealing by deciding to close the plant prior to the full term of the agreement.

TRUE AND CORRECT COPY

Based on the evidence presented by Plaintiff, the Court finds that, absent the entry of this Temporary Restraining Order, there is imminent and substantial danger to Plaintiffs. The facts presented by Plaintiffs demonstrate that there is imminent danger of the continued misconduct by Defendant given its refusal to stop the destruction, demolition, and closing activities. The facts presented further demonstrate that unless Defendant is so enjoined it will continue to exacerbate the injury being caused by its activities related to Plaintiffs right to continue providing coal lignite under the Lignite Mining Agreement.

Further, there is an existing, imminent, and continuing threat of harm to Plaintiff. Specifically, the sole customer for the Sabine Mining Company is the Pirkey Power Plant. By continuing decommissioning, deconstruction, and demolition activities at the plant, as well as certain reclamation activities at Sabine Mine, SWEPCO will cause the Sabine Mining Company to lose its only source of coal sales and therefore its only business opportunity now and in the future. And the destruction of plant equipment will make it difficult if not impossible to resume normal plant operations in the event SWEPCO's decision to close the plant is deemed imprudent.

Based on the following, Plaintiffs will suffer an irreparable injury without an adequate remedy at law, unless the temporary restraining order issues, including (a) the complete inability to run Sabine's business and (b) irreparable injury to plant equipment that cannot be economically remedies, which cannot easily be calculated or compensated for by monetary damages.

The actual and threatened injury to Plaintiffs outweighs any injury to Defendant, and issuance of a temporary restraining order would not disserve the public interest, but would

restore the status quo prior to the wrongful actions of Defendant. The need to issue this order is supported by the above-recited summary of facts.

It is therefore ORDERED that the Clerk issue a Temporary Restraining Order, to continue in effect for fourteen (14) days, or until further order of the Court, restraining and enjoining Defendant and those acting in concert with Defendant from and requiring that:

    a. Defendant be enjoined from destroying, removing or demolishing any equipment located at the Pirkey Power Plant;

    b. Defendant be enjoined from beginning, commissioning, or performing any reclamation activities that that may cause physical, financial, or regulatory harm or impediments to the ability to restart the Sabine Mine; and

    c. Defendant be further enjoined from any other activities that may cause physical, financial, or regulatory harm or impediments to the ability to restart the Pirkey Power Plant.

This Temporary Restraining Order shall not be effective until Plaintiffs file with the Clerk a bond, or cash deposit in lieu thereof, in the amount of $50,000.

It is further ORDERED that Plaintiffs' Application for Temporary Injunction is set for hearing in this Court on the ____ day of May, 2023, at __ o'clock, __.m.

SIGNED THIS ____ DAY OF _____ 2023, at _____ o'clock, __.m.

_____

HONORABLE JUDGE

TRUE AND CORRECT COPY

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Yvonne Ferrari on behalf of Scott Weatherford
Bar No. 24079554
yferrari@jw.com
Envelope ID: 75291879
Filing Code Description: Petition
Filing Description: PLAINTIFFS ORIGINAL PETITION AND VERIFIED APPLICATION FOR INJUNCTIVE RELIEF
Status as of 5/8/2023 3:55 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Weatherford | | sweatherford@jw.com | 5/3/2023 5:08:31 PM | SENT |

TRUE AND CORRECT COPY

23-0471

FILED

AT 2:54 O'CLOCK P. M.
May 9 2023
SHERRY GRIFFIS
CLERK DISTRICT COURT
HARRISON COUNTY, TEXAS
BY _____
DEPUTY CLERK

CAUSE NO. 23-0471 _____

| | | |
|---|---|---|
| THE SABINE MINING COMPANY AND THE NORTH AMERICAN COAL CORPORATION, *Plaintiffs,* | § § § § § § | IN THE DISTRICT COURT |
| v. | § § | HARRISON COUNTY, TEXAS |
| SOUTHWESTERN ELECTRIC POWER COMPANY, *Defendant.* | § § § § | 71ST JUDICIAL DISTRICT |

## TEMPORARY RESTRAINING ORDER

On this day came on to be heard the application for Temporary Restraining Order of Plaintiffs The Sabine Mining Company ("Sabine") and The North American Coal Corporation ("NACC"). After due notice having been given, the Court, having read and considered Plaintiffs' Original Petition and Application for Injunctive Relief, and the verifying Declaration of Andrew Hawbaker, is of the opinion that it clearly appears from the specific facts set forth in Plaintiffs' Petition and the verifying documents that immediate and irreparable injury will result to Plaintiffs before a hearing can be held, unless Defendant Southwestern Electric Power Company ("Defendant") is immediately restrained as set forth in this Order.

Plaintiffs have alleged causes of action for breach of contract, breach of the duty of good faith and fair dealing, and for declaratory judgment, and have a likelihood of success on the merits of those claims. The facts presented by Plaintiffs demonstrate a likelihood of success that Defendant has breached its contract with Sabine as well as its implied duty of good faith and fair dealing by deciding to close the plant prior to the full term of the agreement.

TEMPORARY RESTRAINING ORDER

Page 1

TRUE AND CORRECT COPY

Based on the evidence presented by Plaintiff, the Court finds that, absent the entry of this Temporary Restraining Order, there is imminent and substantial danger to Plaintiffs. The facts presented by Plaintiffs demonstrate that there is imminent danger of the continued misconduct by Defendant given its refusal to stop the destruction, demolition, and closing activities. The facts presented further demonstrate that unless Defendant is so enjoined it will continue to exacerbate the injury being caused by its activities related to Plaintiffs right to continue providing coal lignite under the Lignite Mining Agreement.

Further, there is an existing, imminent, and continuing threat of harm to Plaintiff. Specifically, the sole customer for the Sabine Mining Company is the Pirkey Power Plant. By continuing decommissioning, deconstruction, and demolition activities at the plant, as well as certain reclamation activities at Sabine Mine, SWEPCO will cause the Sabine Mining Company to lose its only source of coal sales and therefore its only business opportunity now and in the future. And the destruction of plant equipment will make it difficult if not impossible to resume normal plant operations in the event SWEPCO's decision to close the plant is deemed imprudent.

Based on the following, Plaintiffs will suffer an irreparable injury without an adequate remedy at law, unless the temporary restraining order issues, including (a) the complete inability to run Sabine's business and (b) irreparable injury to plant equipment that cannot be economically remedies, which cannot easily be calculated or compensated for by monetary damages.

The actual and threatened injury to Plaintiffs outweighs any injury to Defendant, and issuance of a temporary restraining order would not disserve the public interest, but would

TRUE AND CORRECT COPY

restore the status quo prior to the wrongful actions of Defendant. The need to issue this order

is supported by the above-recited summary of facts.

It is therefore ORDERED that the Clerk issue a Temporary Restraining Order, to

continue in effect for fourteen (14) days, or until further order of the Court, restraining and

enjoining Defendant and those acting in concert with Defendant from and requiring that:

a. Defendant be enjoined from destroying, removing or demolishing any equipment located at the Pirkey Power Plant;

b. Defendant be enjoined from beginning, commissioning, or performing any reclamation activities that that may cause physical, financial, or regulatory harm or impediments to the ability to restart the Sabine Mine; and

c. Defendant be further enjoined from any other activities that may cause physical, financial, or regulatory harm or impediments to the ability to restart the Pirkey Power Plant.

This Temporary Restraining Order shall not be effective until Plaintiffs file with the

Clerk a bond, or cash deposit in lieu thereof, in the amount of $50,000.

It is further ORDERED that Plaintiffs' Application for Temporary Injunction is set

for hearing in this Court on the 18 day of May, 2023, at 3:30 o'clock, P .m.

SIGNED THIS 8 DAY OF May 2023, at 2:54 o'clock, P .m.

_Joe Black_
HONORABLE JUDGE

A TRUE COPY of the Original hereof, I certify
Sherry Griffis
District Court Clerk
Harrison County, Texas
By _Brown Johnson_
Deputy Clerk

**TEMPORARY RESTRAINING ORDER**                                   Page 3

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Yvonne Ferrari on behalf of Scott Weatherford
Bar No. 24079554
yferrari@jw.com
Envelope ID: 75291879
Filing Code Description: Petition
Filing Description: PLAINTIFFS ORIGINAL PETITION AND VERIFIED
APPLICATION FOR INJUNCTIVE RELIEF
Status as of 5/8/2023 3:55 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Weatherford | | sweatherford@jw.com | 5/3/2023 5:08:31 PM | SENT |

A TRUE COPY
of the Original hereof, I certify
*Sherry Griffis*
District Court Clerk
Harrison County, Texas
By _____
Deputy Clerk

Skip to Main Content Logout My Account Search Menu New Search Refine Search  Back
Location : All Courts   Help

# REGISTER OF ACTIONS
## CASE NO. 23-0471

| | | |
|---|---|---|
| The Sabine Mining Company, and The North American Coal Corporation vs Southwestern Electric Power Company (SWEPCO) | §<br>§<br>§<br>§<br>§<br>§ | Case Type: **Contract - Other Contract**<br>Date Filed: **05/03/2023**<br>Location: **71st District Court**<br>Judicial Officer: **Morin, Brad** |

---

### PARTY INFORMATION

| | | Attorneys |
|---|---|---|
| **Defendant** | **Southwestern Electric Power Company (SWEPCO)** | |
| **Plaintiff** | **The North American Coal Corporation** | **SCOTT WEATHERFORD**<br>*Retained*<br>512-236-2000(W) |
| **Plaintiff** | **The Sabine Mining Company** | **SCOTT WEATHERFORD**<br>*Retained*<br>512-236-2000(W) |

---

### EVENTS & ORDERS OF THE COURT

| | |
|---|---|
| | **OTHER EVENTS AND HEARINGS** |
| 05/03/2023 | **Original Petition (OCA)** |
| 05/03/2023 | **Original Petition (OCA) - eFile** |
| 05/08/2023 | **EFILE TRANSMITTAL** |
| 05/09/2023 | **CITATION ISSUED** |
| 05/09/2023 | **Citation** |
| | Southwestern Electric Power Company (SWEPCO)       Unserved |
| 05/09/2023 | **MEMO** |

---

### FINANCIAL INFORMATION

| | | | |
|---|---|---|---|
| | **Plaintiff** The Sabine Mining Company | | |
| | Total Financial Assessment | | 366.00 |
| | Total Payments and Credits | | 366.00 |
| | **Balance Due as of 05/09/2023** | | **0.00** |
| 05/08/2023 | Transaction Assessment | | 366.00 |
| 05/08/2023 | eFile Payment | Receipt # 2023-36357 | The Sabine Mining Company | (229.00) |
| 05/08/2023 | State Credit | | (137.00) |

23-0471

CIVIL DOCKET

23-0471

THE SABINE MINING COMPANY AND THE NORTH AMERICAN COAL CORPORATION

OTHER CONTRACT

SCOTT WEATHERFORD

DATE FILED

5 8 2023